FREIGHT CONSOLIDATORS COOPER-
ATIVE, INC., Association Freight
Agents, Inc., Scat Cartage Co., Inc., A
B C Freight Forwarding Corporation,
Freight Consolidators, Inc., Robert
Mishkin and Arthur J. Brown, Plain-
tiffs,

v.

UNITED STATES of America and Inter-
state Commerce Commission,
Defendants,

and

Acme Fast Freight, Inc., American
Freight Forwarding Corporation, Clip-
per Carloading Co., Inc., Freight For-
warders Institute, National Carloading
Corporation, Republic Carloading &
Distributing Co., Inc., Springmeier
Shipping Co., Inc., Universal Carloading
& Distributing Co., Inc., Intervening De-
fendants.

United States District Court
S. D. New York.
June 12, 1964.

Before MARSHALL, Circuit Judge, and EDELSTEIN and CROAKE, District Judges, sitting as a statutory court.

I. Richman, and Meiselman, Mishkin & Reilly, New York City, for plaintiffs.

William H. Orrick, Jr., Asst. Atty. Gen., John H. D. Wigger, Attorney, Department of Justice, Robert M. Morgenthau, U. S. Atty., Southern District of New York (Thomas H. Baer, Asst. U. S. Atty., of counsel), for the defendant, United States of America.

Robert W. Ginnane, General Counsel, Interstate Commerce Commission (Francis A. Silver, Associate General Counsel, Interstate Commerce Commission), for defendant, Interstate Commerce Commission.

Herbert Burstein, S. Sidney Eisen, New York City, Theodore R. Schneider, St. Louis, Mo., Giles Morrow, James L. Givan, Washington, D. C., and George H. Leonard, New York City, for intervening defendants.

EDELSTEIN, District Judge.

This is an action to enjoin, set aside, and annul an order issued by the Interstate Commerce Commission (Commission) on November 28, 1962. Jurisdiction is founded upon 28 U.S.C. § 1336, § 2325; [1] see Administrative Procedure Act, § 10(b), 5 U.S.C. § 1009(b); 318 I.C.C. 507, 521 (1962). The Commission found that plaintiffs were engaged in rendering service as freight forwarders in interstate commerce for compensation without appropriate authority from the Commission, and that such operations were subject to the provisions of § 410 (a) of the Interstate Commerce Act (Act), 49 U.S.C.A. § 1010(a). [2] See §§ 402(a) (5) and 402(c) of the Act, 49 U.S.C.A. § 1002(a) (c). [3] The Commis-

---

[1] 28 U.S.C. § 1336 provides:

"*Interstate Commerce Commission's orders*

"Except as otherwise provided by Act of Congress, the district courts shall have jurisdiction of any civil action to enforce, enjoin, set aside, annul or suspend, in whole or in part, any order of the Interstate Commerce Commission."

§ 2325. "*Injunction; three-judge court required*

"An interlocutory or permanent injunction restraining the enforcement, operation or execution, in whole or in part, of any order of the Interstate Commerce Commission shall not be granted unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title."

[2] 49 U.S.C. § 1010(a) provides, as far as here pertinent:

"No person shall engage in service subject to this part unless such person holds a permit, issued by the Commission, authorizing such service * * *."

[3] 49 U.S.C. § 1002(a) (5) provides:

"The term 'freight forwarder' means any person which (otherwise than as a carrier subject to chapters 1, 8 or 12 of this title) holds itself out to the general public as a common carrier to transport or provide transportation of property, or any class or classes of property, for compensation, in interstate commerce, and which, in the ordinary and usual course of its undertaking, (A) assembles and consolidates or provides for assembling and consolidating shipments of such property, and performs or provides for the performance of break-bulk and distributing operations with respect to such consolidated shipments, and (B) assumes responsibility for the transportation of such property from point of receipt to point of destination, and (C) utilizes, for the whole or any part of the transportation of such shipments, the services of a carrier or carriers subject to chapters 1, 8 or 12 of this title."

49 U.S.C. § 1002(c) provides:

"The provisions of this chapter shall not be construed to apply (1) to the operations of a shipper, or a group or association of shippers, in consolidating or distributing freight for themselves or for the members thereof, on a nonprofit

sion entered an order "requiring the respondents to cease and desist from the performance of such unauthorized operations and thereafter to refrain and abstain from engaging jointly and severally in such operations unless and until appropriate authority therefor is obtained from the Commission." [4]

The central substantive issue that emerges from the cast of contentions presented by the plaintiffs, simply stated, is whether under the facts found the plaintiffs were operating as a *bona fide* shippers association, or whether they were circumventing the regulatory scheme by posing as a shippers association in order to disguise the fact that they were operating as freight forwarders. The determination of this question, apart from the procedural Due Process issues that have been raised is controlling because a shippers association, as defined in 49 U.S.C.A. § 1002(c), is not subject to the regulations applying to freight forwarders. The intervening defendants,[5] who are freight forwarders, together with the Government, contend that the plaintiffs have evaded the Act by attempting to hide their real purpose and function. They urge the Court to affirm the Commission's finding that plaintiffs were masquerading as a shippers association whereas, in fact, they were operating as freight forwarders.

The plaintiffs in their brief, as well as on oral argument, conceded, in effect, the facts in the record,[6] but disputed the conclusions of law drawn therefrom. In addition, they claim that the record before the Hearing Examiner and the Commission was the by-product of unreasonable and arbitrary procedures that denied them a fair hearing and resulted in a violation of Due Process. These claimed errors are: (1) the Hearing Examiner's admission into evidence of Exhibit 45 (concerning a former Commission proceeding against Brown) notwithstanding its ultimate exclusion from the record by the Commission; (2) the Commission's addition of F.C.I., A.B.C., Mishkin and Brown as respondents "who had no notice of the hearing or the charges against them until after some 900 pages of testimony and considerable documentary evidence had been recorded," and (3) the failure of the Hearing Examiner to grant to these plaintiffs a continuance for the presentation of rebuttal evidence.

In sum, the plaintiffs seek to reverse the order of the Commission on the ground that (1) its finding that the plaintiffs were freight forwarders and not a shippers association is not supported by substantial evidence in the record, and (2) that the Commission's findings were infected by procedures which denied plaintiffs a fair hearing.

basis, for the purpose of securing the benefits of carload, truckload, or other volume rates, or (2) to the operations of a warehouseman or other shippers' agent, in consolidating or distributing pool cars, whose services or responsibilities to shippers in connection with such operations are confined to the terminal area in which such operations are performed."

4. A voluntary stay is now in effect. On February 6, 1964, the cease and desist order, which had been previously stayed, was again stayed "until further order of the Commission."

5. Acme Fast Freight, Inc., American Freight Forwarding Corp., National Carloading Corporation; Republic Carloading and Distributing Co., Inc.; Springmeier Shipping Co. Inc.; Universal Carloading and Distributing Co., Inc.; and the Freight Forwarders Institute.

6. The first hearing before this statutory court was held on December 3, 1963, but was adjourned to January 15, 1964, in order to afford plaintiffs an opportunity to comply with the requirement that a certified transcript of the record before the Commission be submitted on an appeal from its order. See § 7 of the Administrative Procedure Act, 5 U.S.C.A. § 1006 (d). Upon the adjourned hearing, the plaintiffs in effect conceded the Commission's findings of fact but not their conclusions of law. "We are not going into the question of fact. Naturally, the evidence of record will be pointed against the plaintiffs herein, because they never did have an opportunity to present any rebuttal evidence. We are merely seeking here to void the order of the Commission on purely legal grounds. We are not at all concerned with the evidence of record in that proceeding." Transcript, January 15, 1964, p. 33.

However, an examination of the record and the applicable statutes [7] belies these contentions.

■ Although freight forwarders and shippers associations to an extent are engaged in similar activities, i. e., consolidation of shipments or "pool-car" operations and break-bulk distributions of freight, they are, nevertheless, separated by sharply defined differences in operation, differences which Congress clearly recognized and provided for in the Freight Forwarders Act. " * * * Section [49 U.S.C.A. § 1002(c)] clearly evinces a strong congressional policy that the regulation envisioned by the Freight Forwarder Act not encroach upon or restrict the right of shippers to join together to gain for themselves the savings of volume transportation rates." See Atlanta Shippers Ass'n, 16 Fed.Carr.Rep. (¶35,694 Fed.Carr.Cas.; I.C.C. January 4, 1964).

Freight forwarders specialize in the handling of less-than-carload and less-than-truckload freight. "They hold themselves out to the general public to provide a complete transportation service, issuing to the shipper a through bill of lading, charging a through rate, and assuming complete common-carrier responsibility for the safe carriage and delivery of the goods. * * * For the physical movement of the goods they utilize the services of other carriers, rail, motor and water. * * * [They] function by gathering shipments from numerous individual shippers, bringing them together at a central point where a forwarder station is maintained, consolidating them into carload or truckload lots and moving them in such consolidated lots to a break-bulk station, and there breaking up the consolidated consignment and distributing the shipments to the individual receivers of the freight. These three steps of the service are de-scribed as assembling (gathering), terminal to terminal (carload and truckload movements between forwarder consolidation and distribution stations) and distribution (converse of gathering)." See H.R.Rep.No.2489, 81st Cong., 2d. session (1950); 2 U.S.Code & Cong.Service, 1950 81st Cong., 2d. Sess., p. 4217.

■ On the other hand, shippers associations do not hold themselves out to the general public but perform services for their dues paying members. They do not assume common carrier responsibility for the shipment from the point of assembling to the point of destination. And, since a true shippers association is a non-profit cooperative association, the members bear the burdens as well as share the benefits of its operations. They bear the expenses of the consolidation and distribution operation as well as sharing in any surplus monies that remain in the association's treasury at the end of the year. See Atlanta Shippers Ass'n, Inc., 316 I.C.C. 259, 273–279, 294–295 (1962); Federal Shippers Ass'n, Inc., 316 I.C.C. 523, 533 (1962); Carload Shippers Ass'n, Inc., 316 I.C.C. 259, 273–279 (1962).[8] "In short, the operations conducted in the name of a purported shipper association, in order to come within the statutory exclusion, must be conducted by the association which at all times acts as *agent* for its shipper members who, *as its principals,* (1) possess the *exclusive* right and ability to control the operations, and (2) assume, both jointly and severally, the essential risks entailed in conducting such operations." Atlanta Shippers Ass'n, Inc., supra at 278 (emphasis in original). Cf. Pacific Coast Wholesalers Ass'n v. United States, 81 F.Supp. 991 (S.D.Cal. 1949), aff'd per curiam, 338 U.S. 689, 70 S.Ct. 411, 94 L.Ed. 474 (1950).

The intervenors claim that § 1002(e) has provided "a fertile field for unscrup-

---

7. Ibid., notes 2 and 3.

8. The mere incorporation of a shippers association whose freight consolidating and distributing activities would not otherwise subject it to the Freight Forwarder Act, 49 U.S.C. § 1002(a) (5), does not in and of itself bring a shippers association within the Act's licensing provisions. See Atlanta Shippers Ass'n, Inc., 16 Fed.Carr. Rep. ¶ 35,694 (Fed.Carr.Cas.I.C.C. January 4, 1964).

ulous entrepreneurs" who have found in it the opportunity to make a profit by avoiding the obligations of regulated activity, such as the need to obtain an operating permit, the necessity to file tariffs, publish rates and charges, and, of course, the obligation to abide by those tariffs.

▆ In view of the strictures imposed upon freight forwarders as distinguished from shippers associations it becomes perfectly clear that great competitive advantages would accrue to an organization if it could free itself of the burdens of compliance with the applicable regulations, whether by the self-styled title of shippers association or otherwise, for the purpose of engaging in the business of freight forwarding. To state the proposition serves to provide the ready answer. For to tolerate such a situation would be repugnant to the Congressional intent and would indeed create a fertile field for unscrupulous entrepreneurs. It would be a re-telling, once again, of the old story of the wolves in sheeps' clothing, but in a more modern setting. Yet these plaintiffs would have this court believe that they are a *bona fides* shippers association simply because they say they are. But the substantial evidence before the Court points to a contrary conclusion. The record details the plaintiffs' method of operations and amply supports the findings of the Commission.

The *modus operandi* employed by plaintiffs, even briefly surveyed, starkly shows the total absence of good faith participation by members in the conduct and affairs of F.C.C. and leaves no doubt that the *raison d'etre* underlying their organization was to operate unlawfully as freight forwarders.

The service received by the individual shipper-members of F.C.C. was identical to that provided by a regulated freight forwarder. F.C.C. assembled and consolidated freight at New York and forwarded such consolidated shipments in carload lots to Chicago and arranged for break-bulk and distribution in Chi-cago. Shippers tendered shipments to F.C.C. on standard common carrier bill of lading forms showing the shipper as consignor and routing via F.C.C. Bills of lading covering the consolidated carload movements from F.C.C. at New York to F.C.C. in Chicago were prepared and signed by Joseph Chevlowe, one of F.C.C.'s principals and its New York manager. It is thus clear that F.C.C. assumed responsibility for the through shipments in the same manner as a regulated freight forwarder.

F.C.C. was incorporated by Joseph Lovi, his attorney, one Jaffe, and Jaffe's secretary, on October 18, 1952, under the Illinois Not For Profit Corporation Act. Cf. Ill.Rev.Stat. Ch. 32, § 163a et seq. (1963 Rev.). Prospective members were solicited on the basis of the volume and desirability of traffic which they had to offer. Eventually four hundred and fifty shippers became "members" through the payment of a membership fee of less than five dollars. But their membership was free of any obligations or responsibility on their part. Membership in F.C.C. was a formality which entitled the members to receive freight rates at a substantial saving, but the members did not share expenses. Members did not share the burdens as well as the benefits of F.C.C.'s operation. See Atlanta Shippers Ass'n, supra.

Moreover, the Commission found that the plaintiffs in their operations failed to satisfy a characteristic that is an essential attribute of a *bona fide* shippers association. The Commission's decision pointed out that the operations of a *bona fide* shippers association require that the activities of the association be subordinated to the control of the membership: "Thus, in all its operations in connection with the consolidation, transportation, and distribution of freight, the association must act solely at the request and under the direction, and for the account and benefit of its members; and as between the members and their association, the former always act as principal and the latter as agent. * * *" 318 I.C.C. 507 at 518.

698

This element of subordination was wholly lacking in plaintiffs' operations. The record supports the Commission's finding that Arthur Lovi and Chevlowe, the original owners of the plaintiff corporations, and Arthur Brown, (who purchased F.C.C. and its distribution agencies, Associated Freight Agents and Scat Cartage Co., Inc.) exercised complete dominion and control over F.C.C. No control whatever was exercised by its shipper-members. All but the select few did not attend the F.C.C. member meetings. Several shipper-members testified that they did not receive notice of meetings and that they were not solicited for proxies and were not provided with an opportunity to vote for directors. Members were not informed of F.C.C.'s financial position and were not consulted in any way respecting the operation of F.C.C.

Although F.C.C. did not earn any profits, the *modus operandi* permitted Lovi and Chevlowe to earn substantial income for themselves. For example, the Commission found that during a three-year period ending in October 1956, they were paid a total of $27,465 and $29,653 respectively by F.C.C. In addition, their combined expense accounts for that period included the following items: auto expenses $7,003; entertainment $18,296; travel $10,878; sales promotion $10,341; Christmas expenses $6,504; and miscellaneous expenses of $2,095. These expenses are typical of a profit-making operation rather than a non-profit shippers association.

The Commission, concerned with the substance of the operation and not its form, pierced the diaphanous Lovi-Chevlowe veil and found that F.C.C. and its satellite companies (A.F.A. and Scat) were operated for the profit of Lovi and Chevlowe and their successors and not for the benefit of the shipper-members. The Commission expressed its conclusion when it found that F.C.C. "is not directed, dominated, and controlled by its members, but, on the contrary, is a mere pawn manipulated at the will of persons other than bona fide shipper members

and used and maintained by them solely to impart a semblance of lawfulness to services which in all material respects are those of a for-profit freight forwarder within the meaning of section 402(a)(5)." 318 I.C.C. 507 at 518.

Nor did the situation change after Lovi and Chevlowe sold their respective interests in A.F.A. and Scat to the plaintiff Arthur Brown, for F.C.C. was not thereafter given over to the control of its shipper members but remained exclusively in the control of Brown and his agents. After Brown assumed control, George Brant and Emmanuel Weitz, acting under the direction of Brown, became F.C.C.'s managers in the consolidation, transportation, and distribution of F.C.C. freight. These individuals, acting through A.F.A., Scat and F.C.I. (a newly formed freight consolidating subsidiary of Brown's ABCO Company) exercised complete dominion over F.C.C.'s operations. The collective activities of the plaintiffs resulted in providing a freight forwarder service to all interested shippers through the means of an obligation-free membership without control or subordination by the members. The Commission correctly held that the plaintiffs were conducting a single jointly conducted unauthorized common carrier freight forwarder service for compensation and that each participant was individually responsible for the unauthorized performance of such service. Accordingly, the Commission correctly interpreted the Act as having application to these plaintiffs. The plaintiffs have failed completely to persuade this Court that they come within the scope of § 1002(c), which has been described by the Government and the intervenors as " * * * a clarifying provision, modifying the definition of a freight forwarder to exclude therefrom those classes of persons who do not do all the things that a freight forwarder does. The converse of this, of course, is that one who does all the things that a forwarder does is subject to regulation, no matter what he may choose to call himself." [9] In this

9. Intervenor's brief, p. 35.

connection, it should be borne in mind that the Interstate Commerce Act, including the Freight Forwarder provisions, is remedial in nature, and that exceptions to the Act's regulatory plan are to be strictly construed. Cf. B & C Truck Leasing, Inc. v. I. C. C., 283 F.2d 163 (10th Cir. 1960). And one who claims the benefit of an exception to such a statute has the burden of proving that he comes within such exception. Spokane & Inland E. R. Co. v. United States, 241 U.S. 344, 36 S.Ct. 668, 60 L.Ed. 1037 (1916).

 We now turn to an examination of the procedural errors claimed by plaintiffs. Their claim that they were denied due process by the broadening of the scope of the investigation by the inclusion of F.C.I., A.B.C., Mishkin & Brown as respondents after more than 900 pages of testimony were taken in the Chicago phase of the hearing is without merit. The Commission's investigation was commenced on December 31, 1958, and hearings were held in Chicago from July 2, 1959, to July 29, 1959. The complaining plaintiffs were added by an order of the Commission dated September 28, 1959. It appears that after five days of testimony it was discovered that Lovi and Chevlowe were no longer involved with F.C.C. and its satellite companies, but that Brown, Brandt, Weitz and Mishkin were the individuals in control. The full extent of Brown's participation was not discovered until the administrative investigation had gone beyond the initial exploratory stage. It is the position of F.C.I., A.B.C., Mishkin and Brown, respondents before the Commission and plaintiffs here, that it was incumbent upon the Commission either to refuse to broaden the scope of the proceedings after its inception, or, in the alternative, to grant a complete hearing *de novo*. They contend that they were denied their right to cross-examine witnesses who had testified prior to the date when they were brought into the case. They claim that the fact that they were cited as parties after so much testimony had been adduced deprived them of the right to counsel at all stages of the proceeding.

But the failure of Mishkin and Brown to be present at the initial stages of the hearing was due to the reluctance of the original respondents and their counsel to disclose promptly their actual interests. Mishkin, attorney for F.C.C., was present at the first stages of the hearing, and therefore had continuing notice of the nature and scope of the subject matter of the inquiry as it proceeded. Had he and Lovi and Chevlowe not been recalcitrant and less than candid in failing to disclose the actual interest of Brown in A.F.A. and Scat and F.C.C., these added respondents would have been in a position to be present at the hearing soon after its inception. Yet, instead of frankly disclosing this information at the outset of the hearings, the attorneys for the Arthur Brown interests elected to remain silent and to allow the hearing to proceed upon the mistaken belief that Lovi and Chevlowe and Brandt were in the control of the affairs of F.C.C. Thus the Brown interests, if they were prejudiced at all, were prejudiced by their own actions. Assuming *arguendo* that they were injured by the failure of the Commission to grant them a *de novo* hearing, then any harm ensuing could have been cured by them. They were afforded an opportunity to recall and cross-examine witnesses but declined to do so. Opportunity to be represented, and to be present and cross-examine witnesses is all that the law requires as a prerequisite of a full hearing. Morgan v. United States, 304 U.S. 1, 18, 58 S.Ct. 773, 82 L.Ed. 1129 (1938); Interstate Commerce Commission v. Louisville & N. R. Co., 227 U.S. 88, 93, 33 S.Ct. 185, 57 L.Ed. 431 (1913).

 The contention that the admission in evidence by the Hearing Examiner of Exhibit 45, a 988-page transcript of a prior proceeding against Brown, (ABC Freight Forwarding Corp. Extension— Nationwide, 303 I.C.C. 149 (1957), over the stated objection of respondents was prejudicial and influenced the conclusions

reached by the Commission is, also, without merit. The Commission struck from the record a consideration of any matters contained in that Exhibit and expressly noted that it played "no part in the determination of the instant proceeding." In any event, it is obvious that Exhibit 45 did not affect the deliberations of the Commission.

▆▆▆▆ Equally without merit is the contention that the Hearing Examiner abused his discretion by failing to adjourn the hearing indefinitely. On the last day of hearings in New York City, after the Bureau and the Intervenors had announced that they did not have any further testimony to offer, plaintiffs counsel orally requested that the proceedings be adjourned to "sometime in March" in order that they might prepare a "rebuttal case." Plaintiffs request was not accompanied by any identification of its alleged witnesses, when or where they would be available, or what relevant testimony they would give in rebuttal. There was no request for subpoenas to these witnesses as authorized by Rule 56, I.C.C. General Rules of Practice, 49 U.S. C.A.Appendix, nor was there a showing that depositions could not have been taken of any material witness as authorized by Commission Rule 57. The Hearing Examiner offered to grant a short postponement. This offer was rejected by plaintiffs. Yet they failed to demonstrate good and sufficient cause why a longer postponement was necessary. See Rule 55, I.C.C. General Rules of Practice, 49 U.S.C.A.Appendix. [10]

The matter of granting a continuance before an administrative agency rests in the sound discretion of the Examiner and reviewing courts will not interfere with its exercise except upon a clear showing of abuse. N. L. R. B. v. Algoma Plywood and Co., 121 F.2d 602, 604 (7th Cir. 1941); Burnham Trucking Co., Inc. v. United States, 216 F.Supp. 561, 564 (D. Mass.1963). There was no abuse of discretion in this case.

▆▆▆▆ Finally, plaintiffs' contention that the scope of the cease and desist order is too broad, vague and general is devoid of merit. The order under attack provides fair notice of what it seeks to prohibit when the order is read in conjunction with the Board's opinion. Consolidated Flower Shipments Inc. v. C. A. B., 213 F.2d 814, 818 (9th Cir. 1954), is authority for the proposition that the entire record, complaint, investigation and the Board's opinion are to be considered as indices of what conduct the Board seeks to proscribe.

The Court has reviewed the record and finds that the order of the Commission is not arbitrary or capricious and is supported by substantial evidence. It is, therefore, affirmed. See A. B. C. Freight Forwarding Corp. v. United States, 125 F.Supp. 926 (S.D.N.Y.1954), aff'd, per curiam, 348 U.S. 967, 75 S.Ct. 531, 99 L. Ed. 753 (1955); see § 10(e) of the Administrative Procedure Act, 5 U.S.C. § 1009(e). [11]

The plaintiffs prayers for relief are herewith denied.

So ordered.

---

10. Rule 55. "Notice of Hearing—(a) Assignment; service and posting of notice; requests for postponement. In those proceedings in which a hearing is to be held, the Commission will, by order or otherwise, assign a time and place for hearing. Notice of such hearing will be posted in the office of the Secretary of the Commission and will be served upon the parties and such other persons as may be entitled to receive notice under the act. A party should be prepared for hearing at its assigned time. Requests for postponement of dates thereof should be made sparingly, and will not be granted except for good and sufficient cause."

11. § 10(e) of the Administrative Procedure Act, 5 U.S.C. § 1009(e) dealing with "Scope of Review," provides in pertinent part:
"* * * the reviewing court shall * * * (B) hold unlawful and set aside agency action, findings, and conclusions found to be * * * (5) unsupported by substantial evidence * * *. In making the foregoing determinations the court shall review the whole record * * *."