PACIFIC COAST WHOLESALERS' ASS'N et al. v. UNITED STATES (INTERSTATE COMMERCE COMMISSION et al, Interveners).

No. 8588–WM.

United States District Court
S. D. California.
Central Division.

Jan. 24, 1949.

992

Gordon, Knapp & Hennessy, of Los Angeles, Cal., for plaintiffs.

James M. Carter, U. S. Atty., and James C. R. McCall, Jr., Asst. U. S. Atty., both of Los Angeles, Cal., for defendant.

Daniel W. Knowlton, Chief Counsel and H. L. Underwood, both of Washington, D. C., for intervener Interstate Commerce Commission.

Harry C. Ames, of Washington, D. C., and Frank D. Catlin and Henry W. Catlin, both of Los Angeles, Cal., for intervener Freight Forwarders Institute.

Before STEPHENS, Circuit Judge, and YANKWICH and MATHES, District Judges.

MATHES, District Judge.

Plaintiffs, a nonprofit California corporation, and individuals comprising its board of directors, seek by this action "to enjoin, set aside, suspend and annul a certain report, requirement and order of the Interstate Commerce Commission." Jurisdiction of this court is invoked under 28 U.S.C.A. § 1336, formerly § 41(28).

Hearing and determination of the cause by "a district court of three judges" is required by 28 U.S.C.A. § 2325, formerly § 47, and this court was accordingly designated by the Chief Judge of the Circuit pursuant to 28 U.S.C.A. § 2284.

The challenged action of the Commission followed "an inquiry and investigation * * * under §· 403(f) of the Interstate Commerce Act, instituted * * * for the purpose of determining whether the operations of the Pacific Coast Wholesalers' Association, a corporation, * * * or of its directors, officers, or representatives are in violation of any provision of part IV of the act, or of any rule, regulation or requirement issued or established pursuant thereto * * *." 264 I.C.C. 134.

In the language of the Commission's report of November 26, 1945 [264 I.C.C. 134], "the association was formed March 27, 1935, by a small group of dealers in automotive parts at Los Angeles, California, as a voluntary unincorporated, nonprofit association, [and was later incorporated] for the purpose of promoting the interest of its members, and to provide a means of assembling, consolidating, forwarding and distributing freight for its members, on a nonprofit basis, and for the purpose of securing the benefits of carload, truckload, or other volume rates. * * * No freight is handled for nonmembers. * * * Believing that it was exempt under the provisions of § 402(c) of part IV of the act, neither the association nor the corporation filed an application for a permit to operate as a forwarder."

The report of November 26, 1945, concluded: "It has been established in this proceeding that the traffic handled is for members of the association, that the association was founded and has been operated, in good faith, for the purpose of effecting savings in freight charges for its members by securing the benefits of car-

load, truckload, or other volume rates, and that the association is operated on a nonprofit basis. These are operations of the character contemplated by the exemption referred to, and may be continued without obtaining authority therefor from this Commission." Thereupon the Commission entered an order: "That this proceeding be, and it is hereby, discontinued."

Thereafter, upon petition of Freight Forwarders Institute, as intervenor, the proceedings were reopened and further hearings held. On December 18, 1947, a "Report of the Commission on Further Hearing" was filed [269 I.C.C. 504], setting aside the report of November 26, 1945.

In the second report, the Commission found, inter alia:

"All of the shipments involved are consigned from eastern origins to the association at Chicago upon instructions of the members, and are there consolidated in carloads and forwarded to destinations or break-bulk points and distributed to members of the association or to their customers in the destination areas. * * *

"The bills of lading show the association as consignee, and Chicago as destination, with notations thereon showing the ultimate consignee and destination. They also bear, in the space provided therefor, the notations 'prepay,' 'prepay through,' 'collect to Chicago and prepay through,' or words of similar purport. Most of the freight bills show the charges as having been prepaid. Some of the invoices show deductions for freight allowed; and in other instances where the charges were billed collect, debit memoranda were issued by the member consignees against the consignors for the amount of the charges, or credit memoranda were issued by the consignors in favor of the consignees.

"In most instances, although the bills of lading are endorsed prepaid, the charges were not actually prepaid to the originating carrier at the time of shipment. Under a credit arrangement between the consignor and the association, the goods were billed collect to Chicago, and upon arrival the association advanced the charges to the originating carrier for its haul to Chi-

cago and issued the association's prepaid freight bill from the point of origin to the final destination, and collected the charges from the consignor. If the charges to Chicago actually were prepaid to the originating carrier, the amount paid is credited on the association's freight bill. In other words, the association advances the charges to the consolidating point and collects from the consignor the forwarder's through less-than-carload rate from origin to destination, plus 3 percent of the total freight charge.

"At destination the freight is delivered to the member consignees or to their non-member customers without additional charge. Thereafter the member is credited with the difference between the amount paid by the consignor, and the costs borne by the association for transportation, administration, handling, distribution, taxes, etc. No refunds are made to the non-member consignors who paid the charges in the manner stated.

" * * * The consolidation of such shipments, including those delivered to customers of the members, and the payment to the members of the 'savings' resulting therefrom, is common practice.

"By far the greater part of the traffic is billed to the members as sub-consignees. A relatively minor part is billed to customers of the members at the direction of the latter. All transactions relating to the purchase and sale of the customer goods are between the members and the consignors. * * *

"The so-called 'savings' are the differences between the charges at the less-than-carload or less-than-truckload forwarder rate from origin to destination, plus 3 percent thereof, on the one hand, and the cost to the association of assembling, consolidating, transporting, and distributing the freight, including the inbound charges to Chicago, the terminal expenses at that point, carload charges from Chicago to destination or break-bulk points, terminal and distributing costs, and transportation taxes, plus additional items charged by the association of 13 cents for administration, 2.25 cents for billing and mailing arrival

994

notices, and 1.125 cents for insurance, on the other hand.

"These differences or 'savings' are paid to the member consignees, regardless of the fact that the charges were collected from the consignors. Occasionally losses are sustained by the consignees because of the inclusion in the consolidated carloads of goods not subject to carload rates, but generally the association attempts to handle only freight on which a saving may be effected. * * *

"The evidence clearly shows, and it is admitted by the members of the association and by its general manager, that 'refunds' are made to the members of a portion of the freight charges paid by non-member consignors."

The Commission thereupon concluded:

"(1) That the association's service in connection with shipments from nonmember-consignors to member-consignees and their customers of goods sold on a f. o. b. destination or delivered-price basis is not a service for the association's members and is not performed on a non-profit basis within the meaning of § 402(c) (1) of the act;

"(2) That the operations of the association as described * * * are those of a freight forwarder in interstate commerce within the meaning of § 402(a) (5) of the act, and that continuance thereof without a permit is in violation of § 410(a) of the act and therefore unlawful; [and]

"(3) That respondents [the individuals] to the extent that they are parties to such unlawful operations, are likewise in violation of § 410(a) of the act."

The "requirements" of the Commission accompanying the report of December 18, 1947, read:

"Respondents will be expected (a) to discontinue on or before March 4, 1948, the operations herein found to be unlawful, and (b) to notify the Commission on or before March 19, 1948 in writing under oath that such operations have been discontinued."

The Commission has construed the somewhat equivocal verb phrase "will be expected" to connote a command. Cf. Rochester Tel. Corp. v. United States, 1939,

307 U.S. 125, 143, 144, 59 S.Ct. 754, 83 L.Ed. 1147.

The petition for reconsideration having been denied, respondents commenced this action on August 30, 1948 to set aside the above quoted requirements. The "effective dates of the aforesaid requirements" have been postponed from time to time by order of the Commission, and now await final judgment herein. Both the Commission and Freight Forwarders Institute have intervened on the side of the defendants and have filed answers and briefs.

The Commission's action in question was taken under the authority of § 403(f) of the Interstate Commerce Act, as amended, 49 U.S.C.A. § 1003(f):

"The Commission may investigate, either upon complaint or upon its own initiative, whether any freight forwarder has failed to comply with any provision of this chapter * * * and, after notice and hearing, take appropriate action to compel compliance therewith."

Jurisdiction to set aside a "requirement" of the Commission is conferred upon this court in § 17(9) of the Act, 49 U.S.C.A. § 17(9):

"When an application for rehearing * * * or reconsideration of any * * * requirement * * * shall have been denied * * * by the Commission * * *, a suit to enforce, enjoin, suspend, or set aside such * * * requirement, in whole or in part, may be brought in a court of the United States under those provisions of law applicable in the case of suits to enforce, enjoin, suspend, or set aside orders of the Commission, but not otherwise."

See: 28 U.S.C.A. § 1336, formerly § 41 (28); cf. Columbia Broadcasting System v. United States, 1942, 316 U.S. 407, 417, 62 S.Ct. 1194, 86 L.Ed. 1563; United States v. Los Angeles & S. L. R. Co., 1927, 273 U.S. 299, 309-312, 47 S.Ct. 413, 71 L.Ed. 651.

However, as said in Rochester Tel. Corp. v. United States, supra, 1939, 307 U.S. 125, 139, 140, 59 S.Ct. 754, 762, 83 L.Ed. 1147, "the range of issues open to review is narrow. Only questions affecting constitutional power, statutory authority and the basic

prerequisites of proof can be raised. If these legal tests are satisfied, the Commission's order becomes incontestable."

The full record before the Commission has been brought here, and it appears beyond dispute that there is evidence of substance to support the Commission's findings of fact. Louisiana & P. B. R. Co. v. United States, 257 U.S. 114, 116, 42 S.Ct. 25, 66 L.Ed. 156; Interstate Commerce Commission v. Union Pacific R. Co., 1912, 222 U.S. 541, 547, 548, 32 S.Ct. 108, 56 L. Ed. 308. "The findings in the report being thus accepted as true, there is left only the inquiry whether they give support to the conclusion. * * * The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." Mississippi Valley Barge Co. v. United States, 1934, 292 U.S. 282, 286, 287, 54 S.Ct. 692, 694, 78 L.Ed. 1260.

The courts will not consider the wisdom of the "requirement" in question, or substitute their judgment for that of the Commission, Assigned Car Cases, 1927, 274 U.S. 564, 580, 47 S.Ct. 727, 71 L.Ed. 1204; The New England Divisions Case (Akron, C. & Y. R. Co. v. United States), 1923, 261 U.S. 184, 204, 43 S.Ct. 270, 67 L.Ed. 605; Interstate Commerce Commission v. Illinois Central R. Co., 1910, 215 U.S. 452, 470, 30 S.Ct. 155, 54 L.Ed. 280. So the precise question here is whether the facts found by the Commission show respondent Pacific Coast Wholesalers' Association to be a "freight forwarder" within the meaning of § 402 of the Interstate Commerce Act, 49 U.S.C.A. § 1002. Section 402(a) (5) provides that:

"The term 'freight forwarder' means any person which (otherwise than as a carrier subject to chapter 1, 8, or 12 of this title) holds itself out to the general public to transport or provide transportation of property, * * * for compensation, in interstate commerce, and which, in the ordinary and usual course of its undertaking, (A) assembles and consolidates or provides for assembling and consolidating shipments of such property, and performs or provides for the performance of break-bulk and distributing operations with respect to such

consolidated shipments, and (B) assumes responsibility for the transportation of such property from point of receipt to point of destination, and (C) utilizes, for the whole or any part of the transportation of such shipments, the services of a carrier or carriers subject to chapter 1, 8, or 12 of this title."

Section 402(c) of the Act, 49 U.S.C.A. § 1002(c), declares that:

"The provisions of this chapter shall not be construed to apply * * * to the operations of a shipper, or a group or association of shippers, in consolidating or distributing freight for themselves or for the members thereof, on a nonprofit basis, for the purpose of securing the benefits of carload, truckload, or other volume rates * * *."

The December 18, 1947, report of the Commission states: "Simple logic would dictate the conclusion that in handling shipments on which freight is borne by non-member-consignors, the association is operating for hire and therefore for profit." But earlier in the report the Commission found that: "All transactions relating to the purchase and sale of the customer goods are between the members and the consignors." And further that: "These differences or 'savings' are paid to the member consignees, regardless of the fact that the charges were collected from the consignors."

It is true of course, as the Commission points out, that "where goods are sold f. o. b. destination, it is ordinarily the seller who bears the freight, who suffers from the excessive charges," and the purchaser who pays the freight does so "solely as agent for the seller." Louisville & N. R. Co. v. Sloss-Sheffield Steel & Iron Co., 1925, 269 U.S. 217, 235, 238, 46 S.Ct. 73, 79, 70 L.Ed. 242. But those are matters of contract between the seller-consignor and the purchaser-consignee.

Here the determinative inquiry is not as to agency as between consignor-seller and consignee-member (cf. Adams v. Mills, 1932, 286 U.S. 397, 406, 407, 52 S.Ct. 589, 76 L.Ed. 1184), but as to the agency relationship between both or either of them and the association. And the facts

996

found by the Commission admit of but one conclusion as to this: That the association at all times acts solely at the request, and under the direction, and for the account and benefit, of the member-purchaser. As between member and association, then, the former always acts as principal, the latter as agent.

The existence of this agency is implicit in the findings of the Commission. The report states that "All of the shipments involved are.consigned * * * upon instructions of .the members" of the association. Admittedly, the facilities of the association are not available to a non-member shipper otherwise than through arrangements made by a member. And the necessary arrangements are that the member as principal instruct the association as agent to handle the shipment. Moreover, both the purpose and the result of the transaction is not to benefit the shipper, but to reduce transportation costs to the member through savings effected in cooperation with other members who likewise employ the association as transportation agent.

When this principal-agent relationship between member-purchaser and the association is borne in mind it is clear that there is no profit to the association from the activities described in·the Commission's report, 49 U.S.C.A. § 1002(c); and it is equally clear that the association, as agent for the members, does not "hold itself out to the general public to * * * provide transportation of property * * * for compensation." 49 U.S.C.A. § 1002(a). (5).

■ The court is of opinion therefore that inasmuch as respondent association acts only as agent of its members "in ·consolidating or distributing freight * * * for the members * * * on a non-profit basis, for the purpose of securing the benefits of carload, truckload, or other volume rates," respondents are not subject to regulation in such activities by the Commission pursuant to part IV of the Interstate Commerce Act. 49 U.S.C.A. § 1001 et seq. Which is to say that the conclusions reached by the Commission in the report of November 26, 1945 [264 I.C.C. 134] were correct.

Accordingly the court holds that the conclusions and requirements of the Commission, predicated upon the report of December 18, 1947 [269 I.C.C. 504], have no rational basis, and must be set aside.

Plaintiffs will submit findings of fact, conclusions of law and judgment setting aside the requirements of the Commission as prayed for, pursuant to local rule 7 within ten days.