COLUMBIA SHIPPERS AND RECEIV-
ERS ASSOCIATION, INC., et al.,
Plaintiffs,

and

Los Angeles Wholesale Institute,
Intervening Plaintiff,

v.

UNITED STATES of America et al.,
Defendants,

and

National Motor Freight Traffic Associa-
tion, Inc., et al., Intervening
Defendants.

NATIONAL MOTOR FREIGHT TRAF-
FIC ASSOCIATION, Inc., et al.,
Plaintiffs,

v.

UNITED STATES of America et al.,
Defendants,

and

Columbia Shippers and Receivers Asso-
ciation, Inc., et al., Intervening
Defendants.

FREIGHT FORWARDERS INSTITUTE,
Plaintiff,

v.

UNITED STATES of America et al.,
Defendants,

and

Columbia Shippers and Receivers Asso-
ciation, Inc., et al., Intervening
Defendants.

Civ. A. Nos. 3506, 3533, 3552.

United States District Court
D. Delaware.
July 2, 1969.

---◆---

Arthur F. DiSabatino, Killoran & Van Brunt, Wilmington, Del., Ronald N. Cobert and Philip R. Ehrenkranz, Grove, Jaskiewicz & Gilliam, Washington, D. C., of counsel, for plaintiffs in C.A. 3506 and intervening defendants in C.A. 3533 and C.A. 3552.

Arthur F. DiSabatino, Killoran & Van Brunt, Wilmington, Del., Stanley E. Tobin and Robert P. Hess, Hill, Farrer & Burrill, Los Angeles, Cal., of counsel, for intervening plaintiff and intervening defendant Los Angeles Wholesale Institute.

Richard L. McMahon, Potter, Anderson & Corroon, Wilmington, Del., Joe G. Fender, Fender & Crawford, Houston, Tex., of counsel, for intervening plaintiff and intervening defendant, National Conference of Non-Profit Shipping Associations, Inc.

David A. Drexler and Lewis S. Black, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Thomas M. Knebel and Bryce Rea, Jr., Rea, Cross & Knebel, Washington, D. C., of counsel, for plaintiffs in C.A. 3533.

H. James Conaway, Jr., and Richard H. May, Young, Conaway, Stargatt & Taylor, Wilmington, Del., George H. Leonard and G. Morrow, New York City, of counsel, for plaintiff Freight Forwarders Institute.

Richard W. McLaren, Asst. Atty. Gen., and John H. D. Wigger, Attorney, U. S. Department of Justice, Washington, D. C., Alexander Greenfeld, U. S. Atty., Wilmington, Del., for defendant, United States of America.

Robert W. Ginnane, General Counsel, and Manny H. Smith, Attorney, Interstate Commerce Commission, Washing-

ton, D. C., for defendant, Interstate Commerce Commission.

Before BIGGS, Circuit Judge, and WRIGHT and LAYTON, District Judges.

## OPINION

CALEB M. WRIGHT, District Judge.

There are before the Court three separate actions to review and set aside the report and order of the Interstate Commerce Commission (ICC or Commission) in National Motor Freight Traffic Association, Inc. v. Columbia Shippers Association, 105 M.C.C. 846 (1967). Jurisdiction and venue in each action are based on 28 U.S.C. §§ 1336 and 1398; each action is brought against the United States as required by 28 U.S.C. § 2322. Applications in each action for a hearing before a three-judge court pursuant to 28 U.S.C. §§ 2284 and 2325 have been granted and, by stipulation of the parties, an order has been entered consolidating the three actions for hearing.

The proceedings of the ICC now challenged concern the legitimacy of certain operating practices of plaintiff (C.A. 3506) Columbia Shippers and Receivers Association, Inc. (Columbia)[1] and the legitimacy of Columbia's claimed status as a non-profit shippers' association not subject to regulation under the Interstate Commerce Act (Act). Columbia is purportedly one of a large number of

associations throughout the country whose membership consists of persons and companies who, in the usual course of business, require the services of common carriers of freight. The primary purpose of these "shippers' associations" is to bring together shippers who, by combining on a regular basis shipments of freight bound for the same destinations, can achieve the advantages of the lower transportation rates applicable to large movements of freight.[2] In actual operation, shippers' associations perform for their members all of the services performed by a freight forwarder as defined by § 402(a) (5) of the Act, 49 U.S.C. § 1002(a) (5). However, because shippers' associations are nonprofit and limit their services to members, they do not hold themselves out to the general public for compensation and thus do not fall within the scope of the provisions of the Act regulating freight forwarders. Indeed, § 402(c) (1) of the Act, 49 U.S.C. § 1002(c),[3] gives explicit recognition to the distinction between shippers' associations and freight forwarders.

Columbia was organized on August 11, 1959 by four Philadelphia-based shippers as an unincorporated shippers' association. The specific motivation for the venture was the desire of one shipper, Westmoreland Metal Manufacturing Company (Westmoreland), to reverse its diminishing ability to compete in the

---

1. The pleadings before the ICC and the final ICC report refer to Columbia as "Columbia Shippers Association," the name utilized by Columbia prior to its incorporation in 1960. This inaccuracy is immaterial to the litigation in this Court.

2. One good illustration of the advantages of shippers' associations is the increased ability of shipper-members to utilize "Plan III piggy-back" rail service. In order to achieve the benefits of the lower Plan III rates, tariffs require that a shipment consist of two trailers containing an "allowed volume" of 70,000 pounds providing that not more than 60% of the freight consists of a single commodity. Quite often, a single shipper will have but one trailer load of freight

or two trailers without the requisite commodity mix. In either event, Plan III rates are not available. However, if two such shippers combine their shipments, they may together achieve the advantage of the lower rates. Shippers' associations are designed to facilitate such combination on a regular basis.

3. § 402(c) (1) reads: "The provisions of this part [Part IV] shall not be construed to apply (1) to the operations of a shipper, or a group or association of shippers, in consolidating or distributing freight for themselves or for the members thereof, on a nonprofit basis, for the purpose of securing the benefits of carload, truckload, or other volume rates * * *."

Chicago market due to high transportation costs. Anthony Santone, Westmoreland's traffic manager, at the direction of a superior, investigated the idea of a shippers' association and eventually solicited the support of three additional shippers who then joined with Westmoreland to form Columbia. On the day of Columbia's formation, representatives of the four shipper-members established themselves as the executive committee of Columbia with ultimate control over its operations and policies. On the same day, Columbia hired plaintiff (C.A. 3506) Duane Barnes, a business acquaintance of Santone, as its general agent in charge of conducting the day-to-day affairs of the association. Barnes agreed to compensation based on the volume of traffic moved by Columbia[4] and agreed to provide and equip office space out of his own funds.[5]

On January 9, 1960, Columbia's executive board, acting on the advice of counsel, voted to incorporate the association, Ex. 20, and on January 19, 1960, a board of directors and corporate officers were elected. Incorporation under the laws of the State of Delaware was finally accomplished in April, 1960.[6] Ex. 22. After its incorporation, Columbia began actively seeking additional members and, at the time the ICC proceedings commenced, membership had increased to 38 shippers.

The great majority of Columbia's activities involve the handling of members' truckload freight[7] bound for certain specified destinations via Plan III piggyback rail service. Arrangements for movements of members' goods are made with general agent Barnes who makes every effort to match or consolidate two or more loads of members to take advantage of volume rates. Neither Columbia nor Barnes operates loading or terminal facilities so that necessary arrangements for assembling or loading of freight are made either by the shipper-member itself or by Barnes at the member's direction. Rail transportation for the consolidated loads, preparation of appropriate bills of lading, and the billing of charges to the shipper-members are all arranged by Barnes. In addition, Barnes arranges for disassembly (break-bulk) and distribution of consolidated loads at destination, designation of the destination cartage agent to perform those services, however, being the responsibility of the members.[8]

4. Barnes' initial compensation was $.20 per hundred pounds of freight with a maximum of $30 per shipment, Tr. 27, 216–217. Later, his commission was changed to a $20 flat rate per trailer, regardless of whether the trailer was fully loaded, Tr. 300–303. The initial arrangement permitted a distinction in Barnes' compensation between less-than-truckload and truckload movements. The later flat-rate basis made that distinction irrelevant.

5. One reason for shifting these administrative expenses to Barnes was apparently a desire to keep association funds-on-hand to an absolute minimum and thus to avoid the need for day-to-day management of cash and expenditures, Tr. 234–235, 238. Columbia's minuscule "capitalization" of $100 ($25 per member), a sum specifically intended to pay for costs of organization and stationery, Tr. 209, reflects this objective.

6. The corporation is both non-profit and non-stock, with participation in the body represented by membership certificates valued at $10. Aside from the nominal sum derived from the membership fees, the amount remaining from the original association's $100 capital, and a small fund representing excess rental fees, the corporation has no assets. Tr. 292–293, 304, 555–556.

7. Columbia does handle a very small amount of less-than-truckload (LTL) freight for members. Generally, the LTL traffic consists of goods which are top-loaded, i. e., situated on top of heavier, floor-loaded freight inside the freight car.

8. In actual practice, destination cartage agents are generally selected from a list of available agents prepared by Barnes with the assistance of various members and approved by the Columbia board of directors. See Ex. 4. Any member, however, retains the power to designate an unlisted agent at any time. Tr. 173, 249–250, 383, 501, 614–615.

Coulmbia handles no freight other than that of its members. However, it does engage in a practice known as "co-loading" whereby freight of a Columbia member is either loaded on a rail car with freight of another non-profit shippers' association or offered to a consolidator or terminal agent for consolidation with freight of a non-member, unaffiliated shipper. Co-loading is practiced by Columbia only in the event that a member's freight must be moved before a matching load of another member will be available. Tr. 242, 547. As a rule, when Columbia co-loads with a non-member, unaffiliated shipper, it utilizes the consolidation service of either of two local terminal agents, one of which—Shippers Traffic Service, Inc. (STS)—is owned and controlled by Barnes.[9]

Proceedings before the Commission against Columbia and Barnes were instituted by complaint of plaintiffs (C.A. 3533) National Motor Freight Traffic Association, Inc. (NMFTA), Common Carrier Conference—Irregular Route, and Regular Common Carrier Conference on February 24, 1961. The basic issues presented by the complaint were, first, whether, in light of Columbia's incorporation and certain activities of Barnes, Columbia is a bona fide shippers' association outside the scope of ICC regulation and, secondly, whether co-loading, as it is practiced by Columbia, is permissible for an unregulated shippers' association. After comprehensive hearings, an ICC Examiner ruled that Columbia's activities were wholly legitimate and that the complaint should be dismissed. Division I of the Commission affirmed the Examiner's report, one Commissioner dissenting. On December 7, 1965, the full Commission declared that the proceeding involved an issue of general transportation importance and subsequently granted complainants' petition for reconsideration. On reconsideration, the Commission made three findings which are the subject of the instant law-

suit: first, that Columbia is a bona fide shippers' association under § 402(c) (1) of the Act; secondly, that Columbia's practice of co-loading with other non-profit shippers' associations does not contravene the Act; and thirdly, that Columbia's practice of utilizing the services of STS to co-load with independent, non member shippers, done as it is without a freight forwarders permit, is a violation of the Act. Accordingly, the Commission entered a cease and desist order requiring Columbia to terminate the specified unlawful co-loading practice.

Plaintiffs before this Court in C.A. 3533 now challenge the first and second findings of the Commission and seek an order enjoining any further operations by Columbia. Plaintiffs in C.A. 3552 challenge only the second finding of the Commission and seek a determination that co-loading between two bona fide shippers' associations is unlawful. And plaintiffs in C.A. 3506 challenge only the third finding of the Commission and seek dissolution of the Commission's cease and desist order.

The Court, in considering these various challenges, must adhere to the well-settled standard for review of agency orders, set forth in the Administrative Procedure Act, 5 U.S.C. § 706:

" * * * The reviewing court shall—
   \*    \*    \*    \*    \*

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
   \*    \*    \*    \*    \*

(E) unsupported by substantial evidence * * * In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error."

Proper application of the substantial evidence standard has been considered in Acme Fast Freight, Inc. v. United States, 281 F.Supp. 314, 317–318 (D.Del.1968) and Acme Fast Freight, Inc. v. United

---

9. Barnes owns 51% of STS stock. Tr. 68. The remaining interest is owned by his wife (39%) and his attorney (10%). Tr. 70.

States, 146 F.Supp. 369, 372 (D.Del. 1956) and this Court will draw appropriate guidance from these decisions.

Turning first to the Commission's determination that Columbia is a bona fide shippers' association, the Court's focus on review is whether there is substantial evidence in the record to support the conclusion that Columbia's operations fall outside the scope of the regulatory provisions of the Act, specifically the provisions of Part IV regulating freight forwarders.[10]   The significant regulatory provision here is § 402(a) (5) of the Act, 49 U.S.C. § 1002(a) (5), which sets forth in detail the definition of "freight forwarder":

> "The term 'freight forwarder' means any person which (otherwise than as a carrier subject to part I, II, or III of this Act) holds itself out to the general public as a common carrier to transport or provide transportation of property * * * for compensation, in interstate commerce, and which, in the ordinary and usual course of its undertaking, (A) assembles and consolidates or provides for assembling and consolidating shipments of such property, and performs or provides for the performance of break-bulk and distributing operations with respect to such consolidated shipments, and (B) assumes responsibility for the transportation of such property from point of receipt to point of destination, and (C) utilizes, for the whole or any part

of the transportation of such shipments, the services of a carrier or carriers subject to part I, II, or III of this Act."

If indeed Columbia performs or provides for the general public and for compensation all of the services enumerated in § 402(a) (5), then § 410(a), 49 U.S.C. § 1010(a), and § 402(a) (7), 49 U.S.C. § 1002(a) (7)[11] require that Columbia terminate operations until such time as appropriate authorization from the Commission is obtained.  If, however, Columbia's operations do not meet the terms of § 402(a) (5), then the Commission has no basis for governing Columbia's operations.  See National Motor Freight Traffic Ass'n v. United States, 242 F.Supp. 601, 605 (D.D.C.1965).

The Commission has determined that Columbia does not fall within the terms of § 402(a) (5).  In reaching that conclusion, the Commission has proceeded according to the test set forth in Atlanta Shippers Association, Inc.—Investigation of Operations, 322 I.C.C. 273, 278–279 (1964):

> " * * * whenever an apparent shippers' * * * association ostensibly consolidates and distributes freight, the lawfulness of the operation may be determined by application of either of the following standards, depending upon the particular facts and circumstances of the questioned operations: (1) whether the * * * association itself is, in substance, engaged in the

10. An alternative approach is to examine whether the record will support the conclusion that Columbia falls within the terms of § 402(c) (1) of the Act excluding shippers' associations from regulation.   However, since the genuine issue in this matter is whether Columbia is a freight forwarder operating without a permit and since § 402(c) (1) is not truly an exemption from regulation but rather a "clarifying provision," see Atlanta Shippers Association, Inc.—Investigation of Operations, 322 I.C.C. 273, 276 (1964) citing Report No. 1172, Committee on Interstate and Foreign Commerce, House of Representatives, pp. 5–6, the most direct route is to measure Columbia's operations against the specific regulatory provisions defining and governing

the operations of freight forwarders.  See Freight Consolidators Co-op. v. United States, 230 F.Supp. 692, 696–697 (S.D. N.Y.1964);  Pacific Coast Wholesalers' Ass'n v. United States, 81 F.Supp. 991, 995 (S.D.Cal.1949).

11. § 410(a) reads:  "No person shall engage in service subject to this chapter unless such person holds a permit, issued by the Commission, authorizing such service * * *."

§ 402(a) (7) adds:  "The term 'service subject to this chapter' means any or all of the service in connection with the transportation in interstate commerce which any person undertakes to perform or provide as a freight forwarder. * * *."

business of serving the public as a forwarder of property for compensation, or in other words, whether it is a seller of forwarder service, and (2) whether the * * * association (or the shipper-members through their organization) is purchasing for compensation, a complete transportation service in which the essential risks and burdens of freight assembly, consolidation, forwarding, break-bulk, and distribution are assumed for it (or its members) by a person not licensed by this Commission."

Putting aside for the present the question of whether the co-loading practices of Columbia represent sale of forwarder services to non-member shippers, no party contends that Columbia is a seller of forwarder service within the meaning of the Atlanta Shippers test. Accordingly, the Commission has directed its inquiry to whether Columbia (or its members) is a purchaser of complete forwarder services from a person not licensed by the Commission and, in doing so, has proceeded by asking the question:

"Are the freight consolidating and distributing operations such that any person or persons other than the *shipper-members* of the association (a) have any right or ability to control, direct, or dominate such operations, or (b) bear the essential risks and burdens, financial and otherwise, of conducting the operations under consideration," (emphasis supplied),

a test also set forth in Atlanta Shippers, 322 I.C.C. at 283. See also United States v. Drum, 368 U.S. 370, 82 S.Ct. 408, 7 L.Ed.2d 360 (1962). Having decided that, on the record before it, both (a) and (b) of the test must be answered in the negative, the Commission has determined that Columbia is not within the terms of the Act and thus is a bona fide shippers' association.[12]

Plaintiffs in C.A. 3533—the only parties before this Court challenging this first ICC determination—do not challenge the propriety of the standards and tests utilized by the Commission. Nor do they challenge the conclusion, supported as it is by substantial evidence, see Tr. 205, 212, 238, 263, 381–383, 422, 425, 431, 512, 543, 572, 614–615, 632, 649, 650, 688, 719–720, that no person other than shipper-members of Columbia have the right to control Columbia's operations. They do object, however, to the conclusion that no persons other than shipper-members of Columbia bear the essential risks and burdens of conducting Columbia's operations. Accordingly, the Court will confine its review to the question of whether there is substantial evidence in the record to support the Commission's negative answer to (b) of the Atlanta Shippers "control risks and burdens" test. In addressing this question, however, the Court notes its disagreement with the plaintiffs' position that the "control" and "risks and burdens" inquiries are separate and unrelated.[13] Instead, the Court is of the

12. In analyzing the import of the "control risks and burdens" test, the Commission in Atlanta Shippers noted, 322 I.C.C. at 283:
"Both aspects of this question must be answered in the negative if the considered operations are, in substance and reality, those of a bona fide group or association of shippers acting together on a non-profit basis to achieve the permissible purposes specified in the Act. An affirmative answer to either part of this question, on the other hand, necessarily would result in the conclusion that the purported members of the group or association are, in fact, purchasing transportation from a person or

persons engaged in unlawful freight forwarding service."

13. Plaintiffs' position is apparently based on the Commission's assertion in Atlanta Shippers quoted at n. 12, supra. The inaccuracy of plaintiffs' interpretation is affirmed by the Commission itself in its Report in the instant case:
"It is true that the examiner tendered [sic] to merge his discussion of the 'risks and burdens' with his discussion of 'control' but this appears to be more a matter of style than of substance, particularly since the facts concerning 'risks and burdens' and 'control' are not entirely separable." 105 M.C.C. at 852.

opinion—and will proceed on the theory —that the two inquiries are integrally related and, specifically, that retention by Columbia members of the right to control and dominate Columbia's operations significantly reduces the likelihood that the members have in fact passed the essential risks and burdens of the operations on to a third party.

Plaintiffs' contention that the Commission erred in finding no shift of essential risks and burdens is based on their position that those risks and burdens have in fact been shifted either to Barnes or, alternatively, to the association (as a corporate body). The Court's consideration of the issue here is complicated by the absence of a meaningful definition of the key term "essential risks and burdens, financial and otherwise." The Commission's explanation of the term in Atlanta Shippers [14] is of some help. And the briefs and arguments of the parties add some clarification to that explanation, see, e. g., Transcript of Oral Argument, February 28, 1969, pp. 16–18. However, in the absence of a comprehensive expert definition, the Court must rely on its own judgment in evaluating the evidence.

Considering plaintiffs' position with regard to Barnes first, examination of the record reveals that Barnes has assumed responsibility for renting and equipping office space, hiring and paying the necessary manpower to staff the office, and paying a $5 fee for insurance coverage on each shipment,[15] all from his own pocket. Plaintiffs argue that, because the cost to shipper-members of shipping their freight is based on actual cost of transportation services plus a fixed "association fee," the only significant variable costs in the operation are those borne by Barnes. Thus, they argue, it is Barnes who bears the risk that the operations of the association will be unprofitable.

Plaintiffs' position has no merit. An examination of the record reveals that Barnes rents one very-small office, has hired one assistant to help with paperwork, and pays for one phone and some other office incidentals, all of which Barnes uses for his STS work as well as for his Columbia work. Tr. 94–95. In addition, Barnes pays a $5 insurance fee on every shipment.[16] Columbia, on the other hand, assumes responsibility for hiring attorneys as well as a regular (part-time) accountant and assumes the cost of billheads and stationery Tr. 236; Ex. 22, all from funds collected by various extraordinary rental and rate ar-

14. " * * * the major financial risk entailed in the conduct of association operations under section 402(c), other than such risks as are readily insurable, is the risk of loss, or to put it another way, the risk that the savings resulting from the association's use of applicable carload, truckload, or other volume rates, will be eaten up or more than offset by the association's operating expenses. And so long as this essential transportation burden is, in fact, borne ultimately by the members (rather than by someone else) who exercises effective surveillance over the physical consolidation and distribution operations, it is clear that there has been compliance with the statutory scheme." 322 I.C.C. at 285.

15. The record is not clear on the exact status of the insurance fee. Plaintiffs' (C.A. 3533) interpretation of the evidence is that, while the $5 fee was first paid by Columbia from a special fund, the members subsequently agreed to turn responsibility for paying the fee over to Barnes and to increase Barnes' commission by the $5 amount. See Opening Brief of Plaintiffs, C.A. 3533, p. 25. Columbia and Barnes, on the other hand, deny that Barnes pays the insurance fee and point to the Commission's finding that "an account for certain expenses such as insurance is maintained by the association." 105 M.C.C. at 851. See Reply Brief of Plaintiffs, C.A. 3506, p. 4, n. 2.

The Court is inclined to accept the position that Barnes is responsible for paying the per shipment insurance fee. See Ex. 19, 20; Tr. 438. However, since the record is clear that Barnes, if he is paying the fee, is not insuring himself against the claims of members for damages, etc. but rather simply paying a fee required by the terms of a "blanket" insurance policy in the name of the association, Tr. 437–438, the Court considers neither of the two positions presented dispositive of the risks and burdens issue now before it.

16. See n. 15, supra.

rangements with Columbia members, see Tr. 292–293, 304, 555–556. More importantly, however, the record indicates that Columbia members, and not Barnes, bear the risk that transportation rates will increase plus the risk that, as beneficial owners of the goods shipped, any uninsured loss will accrue to them.[17] Finally, each Columbia member individually assumes the financial burden of paying transportation charges on collect shipments not paid for by the member's consignee. See Ex. 20.

■ In light of the distribution of burdens indicated by the record, there is clearly sufficient evidence to support the Commission's conclusion that Columbia members have not shifted the essential risks and burdens to Barnes. To be sure, there is some risk involved that rent, the assistant's wages, phone rates, etc. will increase and reduce the profitability of Barnes' position, though the record indicates that Barnes' compensation is subject to review and thus to periodic increases to offset higher costs. Even forgetting review of compensation, however, the risks and burdens which Barnes bears are simply not of the quality or magnitude which would dictate a change in both the association's and Barnes' legal status. Indeed, whether Barnes or the association pays the small office rent, the single assistant's wages, and the phone bill can hardly be the key to determining whether Columbia is a purchaser of complete freight forwarder services (in this case from Barnes) or instead a bona fide shippers' association.

Plaintiffs contend, in the alternative, that the essential risks and burdens have been shifted by the members to the association and that, by virtue of Columbia's corporate status, the members have succeeded in insulating themselves from any significant liability for any actions of the association. Plaintiffs draw support for their position from the Commission's statement that:

> " * * * we are persuaded that the essential responsibilities, risks, and burdens are not upon the general agent but rather upon the *association* and we conclude that the defendant association is a bona fide shippers' association within the meaning of section 402(c) (1) * * *." 105 M.C.C. at 851–852 (Emphasis supplied.)

■ This so-called "corporate issue" has been litigated extensively both before the Commission and the courts, see, e. g., Atlanta Shippers, supra at 285–288 and Freight Forwarders Institute v. United States, 263 F.Supp. 460 (S.D.N.Y.1967), and the law is now clear that "the fact of incorporation, standing alone, does not affect the status under part IV of otherwise lawful shipper-association operations." 322 I.C.C. at 288. Thus, any contention that mere corporate status affects the legal result here is without merit. But there is more to plaintiffs' position, namely the argument that, even assuming the basic legitimacy of corporate status, the shipper-members still cannot in fact shift all essential reponsibility to the association, as the Commission's language indicates they have. Admittedly, the Commission's language is ambivalent. However, in view of the clear record in this case and the pro-

---

17. The Commission, in Atlanta Shippers, supra, made specific reference to the importance of the beneficial ownership of members:

> " * * * the shipper members of an association, incorporated or not, are never fully divorced from their fundamental responsibilities as organizers and controllers of the association and as shippers of the freight transported in the service of the association. At the least, such shippers will necessarily

be responsible as the beneficial owners of the goods moved and, to that extent, there can logically be no effective insulation between them and third persons." 322 I.C.C. at 288.

See also the Commission's report in Regulations for Payment of Rates and Charges, 326 I.C.C. 483, 494–495 (1966) requiring shippers' associations to advise carriers which member is the beneficial owner of freight on the bill of lading.

nouncement of the Commission in Atlanta Shippers that,

" * * * when shippers acting together organize, operate, and control their own corporation to conduct the necessary consolidation and distribution functions with respect to their (the shippers') own freight, and if such *shippers* bear the important risks and burdens which those operations entail (including the risk of loss or of obtaining no savings by such joint activity), it is clear that there is no holding out to the general public to provide transportation of property for compensation within the meaning of the forwarder definition." 322 I.C.C. at 288 (Emphasis supplied),

the Court is of the opinion that the Commission did not intend to suggest that all the essential risks and burdens of operation had been effectively shifted to Columbia's naked corporate shell. Indeed, the record is clear that the shipper-members of Columbia, as beneficial owners of goods shipped, as the persons in fact responsible for payment of counsel fees, accountant fees and the costs of other incidental matters, and finally as the persons bearing the risk that increases in the actual cost of transportation will reduce the advantages of association, are the bearers of the essential risks and burdens of Columbia's operation. These facts, coupled with the clear evidence

that the members assume responsible control of the operations of the association, bring Columbia within the spirit of the pronouncements in Atlanta Shippers and Freight Forwarders Institute, 263 F.Supp. at 465, regarding the effect of the corporate form on an association's status under the Act. Accordingly, the Court is constrained to uphold the Commission's judgment that Columbia is a bona fide shippers' association.[18]

■ Turning next to the Commission's determination that Columbia's practice of co-loading with other nonprofit shippers' associations does not contravene the Act, this issue being primarily a legal rather than a factual one, the Court must apply, in addition to the "substantial evidence" test generally applicable to this action, the standard of review set forth at 5 U.S.C. § 706(2) (A):

" * * * the reviewing court shall
* * *

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

Accordingly, the Court's focus on review is whether the evidence and the law will support the conclusion that Columbia's practice of co-loading with other non-

---

18. Counsel for plaintiffs in C.A. 3533 raise the specific argument that, in the event a shipper-member of Columbia neglects to pay transportation charges owing to a carrier, the carrier would have recourse only against the judgment-proof corporate shell of Columbia (since Columbia is listed as the consignor on any bill of lading covering an association shipment) and thus the delinquent member would escape liability. Support for this argument is drawn from the unreported opinion of the District Court for the Northern District of California in North American Car Corp. v. United States Rubber Co. See Opening Brief for plaintiffs in C.A. 3533, Apps. A, B.

The Court cannot accept counsel's argument. In the first place, the Court in Freight Forwarders Institute and the Commission in Atlanta Shippers in all

likelihood had the eventuality raised well in mind when they decided that corporate status was acceptable. In the second place, solicitation of credit from a carrier by a shipper in the name of a corporation with an intentionally minuscule capital position would, in all likelihood, entitle the carrier to penetrate the corporate shell and seek recourse against the beneficial owner of the transported goods. The unreported California opinion relied upon by counsel is not persuasive authority to the contrary.

The Court notes the evidence that at least one rail carrier has looked directly to an association member for recovery of damages to a trailer leased in the name of the Association, Tr. 434–435, as an indication that members have not in fact utilized the corporate veil for insulation from legitimate debts of operation.

profit shippers' associations does not bring Columbia within the terms of the provisions regulating freight forwarders, particularly § 402(a) (5).[19]

Briefly, the practice of co-loading with other shippers' associations involves the loading of freight belonging to a Columbia member on the same rail car with freight of a member of a separate association. The advantages and obligations of this practice, as far as the Columbia member is concerned, are apparently the same as if the matching load were that of another Columbia member. The only difference is that Columbia has looked beyond its own membership to that of another association for the freight needed to obtain volume rates. The record indicates that such co-loading is practiced by Columbia only when a member's freight must be moved before a matching load of another Columbia member will be available. Tr. 242.

In examining this manner of joint-loading freight, the Commission noted, first, that:

" * * * when [Columbia] coloads with another shippers' association, both are engaged in furtherance of their non-profit activities pursuant to the statutory objective of section 402 (c)." 105 M.C.C. at 856,

and, secondly, that,

" * * * there is no specific bar to the practice of coloading by separate shippers' associations as long as the co-loading benefits only the members of each shippers' associations [sic] and there is no holding out of service to the general public." Id.

Interpreting these conclusions in light of the Act, the Commission has determined that the coloading practice in question does not subject Columbia to regulation because it does not represent service held out to the general public "for compensation," a required element of freight forwarder service under § 402(a) (5) of the Act.

■ The Court, after careful consideration, accepts as proper the Commission's conclusion that the coloading activity in question here is not service[20] "for compensation." The standards governing this profit criterion are set forth in Atlanta Shippers, supra. There the Commission ruled that

" * * * service [to any non-member] * * * supplied by the association with a purpose to profit from transportation as such, as distinguished from a purpose merely obtain for its members the savings of carload, truckload, or other volume rates * * * "

is not a permissible adjunct of an association's operations. 322 I.C.C. at 282. Conversely, service to any non-member supplied for the purpose merely of obtaining for association members the savings of volume rates is consistent with a non-profit operation and is therefore permissible without regulation. There is clearly substantial evidence to support the conclusion that Columbia's joint loading with other associations is solely to achieve for Columbia members the savings of lower rates. See Tr. 241. Accordingly, Columbia properly falls within the Atlanta Shippers rationale.

The authority of Atlanta Shippers is buttressed by Pacific Coast Wholesalers' Ass'n v. United States, 81 F.Supp. 991 (S.D.Cal.1949), affirmed per curiam, United States v. Pacific Coast Wholesal-

19. Again, the Court will examine the Commission's ruling as a determination that Columbia is outside the terms of § 402(a) (5) rather than as a determination that Columbia is within the terms of § 402(c) (1). See note 10, supra.

20. The Court need not, in light of its conclusion on the "compensation" issue, discuss the separate question of whether

Columbia's coloading with separate shippers' associations in fact involves provision of "service" (i. e., complete freight forwarder service) as that term is defined in § 402(a) (5). A very similar question, however, is raised and discussed below in the context of coloading with non-member, unaffiliated shippers and, to the extent that discussion is relevant to the instant coloading issue, appropriate references will be made.

ers' Ass'n, 338 U.S. 689, 70 S.Ct. 411, 94 L.Ed. 474 (1950). There, a bona fide shippers' association was handling shipments of freight moving from non-member consignors to member-consignees on a delivered-price basis. Essentially, the association would arrange for several non-member consignors to combine their freight into a single shipment destined for association members. Arrangements would also be made for payment of all transportation charges for the shipment by the association at destination. The association would then bill each consignor the higher rail rates applicable to its segment of the full shipment, pay the carrier the lower rate applicable to the full shipment, and divide the excess among its members. As a result, the association members received their shipments with all the benefits of the lower volume rates.

In ruling that such service to non-members was permissible without regulation, the lower court held:

" * * * both the purpose and the result of the transaction is not to benefit the [non-member] shipper, but to reduce transportation costs to the member through savings effected in co-operation with other members who likewise employ the association as transportation agent." 81 F.Supp. at 996.

On review, the Supreme Court affirmed the lower court, noting that:

" * * * the court saw no reasonable ground for ruling that the association was on a profit basis * * *." 338 U.S. at 691, 70 S.Ct. at 413.

There are, of course, a number of factual differences between the Pacific Coast Wholesalers' cases and the instant case. Nonetheless, the decisions do stand for the proposition that activities aimed solely at attaining for members the benefits of lower transportation rates, even though those activities involve transactions with non-members, are not activi-

ties conducted "for compensation" within the meaning of § 402(a)(5) and thus not subject to regulation.

In light of these various decisions and the record in this case, the Commission's determination that coloading with other shippers' associations is not "for compensation" is supported by both the law and the evidence and the Commission's approval of this practice is affirmed.

The final issue before the Court is the propriety of the Commission's conclusion that Columbia's utilization of the services of Shippers Traffic Service (STS) contravenes the Act.

■ STS, variously known as a consolidator, terminal agent, or shippers' agent, is a small, for-profit corporation, owned and controlled by Duane Barnes,[21] whose function is to arrange for consolidation of freight of two or more shippers into a single shipment sufficiently large to qualify for volume rates. Its operations are not subject to regulation under the Act as long as they are "confined to the terminal area in which such operations are performed," § 402(c)(2), 49 U.S.C. § 1002(c)(2), so that if STS arranges for the consolidation of the separate loads at the origin terminal area, it is barred by law from providing any further services or assuming any responsibility for the combined shipment once the goods are in transit. STS has no facilities other than one office and performs no physical transportation services for its customers. Tr. 97, 102. Its function is solely to "introduce" two or more shippers with freight bound for a single destination so that they might, by joint effort, achieve a reduced rate.

One of STS's clients is Columbia.[22] STS serves Columbia, however, only in those instances where the freight of a Columbia member must be moved before a matching load of another Columbia member will be available. Tr. 547. In that event, Barnes, as general agent of

21. See note 9, supra.

22. In addition to Columbia, STS regularly serves five individual shippers, none

of which is a member of Columbia. Tr. 96.

Columbia, notifies the member that no matching load is available and seeks instructions as to the proper disposition of the "hanging" freight. Tr. 242. If the member's instructions are to move the load through STS, Barnes will, as operator of STS, attempt to arrange for consolidated movement of the freight. Tr. 95, 242. The record is amply clear that STS performs services for Columbia only upon request. Tr. 95, 96–97, 547, 719–721.

The service which STS performs for Columbia involves arranging for consolidation of Columbia freight with the freight of non-member, unaffiliated shippers. Tr. 95–96. In other words, through STS, Columbia is able to co-load, not with another non-profit shippers' association, but with a non-member, for-profit shipper. It is this co-loading practice to which the Commission's cease and desist order is directed.

The precise basis for the Commission's cease and desist order, unfortunately, is not clear. Indeed, considerable confusion has arisen among the parties to this action as to whether the Commission's challenge to this co-loading practice is based on Columbia's use of a shippers'

agent in general or, instead, on Columbia's use of STS in particular. The scope of the Commission's language would seem to preclude use of *any* shippers' agent, not just STS, to co-load with non-member, unaffiliated shippers;[23] on the other hand, the Commission's Report also indicates that the factor crucial to its holding is the link between STS and Columbia in the person of Duane Barnes, a link which the Commission concludes puts STS "under the effective control of" Columbia, 105 M.C.C. at 858, and sets STS apart from all other shippers' agents.[24]

Notwithstanding the Commission's imprecision, a number of factors indicate that the Commission did not intend to outlaw the use of an independent shippers' agent to co-load with non-member, unaffiliated shippers but that it disposed of this final co-loading issue solely on the basis of its finding that STS is under the effective control of Columbia. One such factor is the Commission's refusal to rule on the legality of Columbia's admitted use of Delaware Valley Freight Terminal, an independent shippers' agent having no connection whatsoever with Columbia.[25]

---

23. "Under these circumstances, we believe that a shipper's [sic] association cannot coload with nonmember, for-profit shippers * * *." 105 M.C.C. at 853.

 * * * * *

" * * * the Supreme Court's decision in United States v. Pacific Coast Wholesalers Association, supra, supports the conclusion * * * (2) that a nonprofit shippers' association may not coload with nonmember for-profit shippers." Id. at 854.

See also Piggy-Back Shippers Association of Florida—Investigation of Operation, 332 I.C.C. 349 (1968) (dicta), reaffirming the above language in Columbia Shippers.

24. "[Columbia] contends that the consolidation service in question is legally performed by its agent, [STS]. However, we find that the consolidation service performed by [STS] is under the effective control of [Columbia] and that [Columbia] cannot avoid responsibility in connection with the coloading of member traffic with for-profit shippers through

the use of a shippers' agent which, in fact, is the corporate alter ego of its own general agent." 105 M.C.C. at 858.

 * * * * *

" * * * the operations of a shippers' association and a shippers' agent cannot be combined so as to enable defendants jointly to provide essentially a complete freight forwarding service without appropriate authority." Id. at 858–859.

25. The Commission's refusal to rule on the use of Delaware Valley Freight Terminal may stem in part from the fact that neither Delaware Valley nor any of its officers were party to the proceedings. In any event, the absence of Delaware Valley or any independent shippers' agent as parties persuades the Court that it should not remand the question of co-loading through an independent shippers' agent to the Commission for decision. Freight Forwarders Institute v. United States, 263 F.Supp. 460, 466–469 (S.D.N.Y.1967) is not, in the Court's opinion, authority to the contrary.

105 M.C.C. at 859. A second factor is the statement to this Court by counsel for the ICC that the Commission's decision is, in fact, limited to Columbia's use of a dependent shippers' agent. Joint Brief of the United States of America and the Interstate Commerce Commission, p. 33. Accordingly, the Court will proceed on the basis that the Commission's decision is limited to the issue of association co-loading through a dependent shippers' agent.

█ The Commission's precise holding on this issue is that Columbia's use of a dependent shippers' agent—STS [26]— to co-load with non-member, unaffiliated shippers constitutes the unauthorized provision by Columbia of a complete freight forwarder service. The term "complete freight forwarder service" necessarily derives its meaning from the regulatory provisions of the Act, most notably § 402(a) (5):

> "The term 'freight forwarder' means any person which * * * holds itself out to the general public as a common carrier to transport or provide transportation of property, or any class or classes of property, for compensation, in interstate commerce, and which, in the ordinary and usual course of its undertaking, (A) assembles and consolidates or provides for assembling and consolidating shipments of such property, and performs or provides for the performance of break-bulk and distributing operations with respect to such consolidated ship-

ments, and (B) assumes responsibility for the transportation of such property from point of receipt to point of destination * * *."

Thus, § 402(a) (5) requires, among other things, that a freight forwarder perform or provide for the disassembly (break-bulk) and distribution of consolidated loads and assume common-carrier responsibility for the transportation of such property from point of receipt to point of destination, all for the general public. The failure of an organization to provide these specific services can only mean that the organization is not providing a complete forwarder service and thus is not within the regulatory provisions of the Act. See National Motor Freight Traffic Association v. United States, 242 F.Supp. 601, 605 (D.D.C. 1965).

█ Turning to the combined operations of STS and Columbia, the record will not support the Commission's conclusion that Columbia's use of STS involves provision of complete forwarder service. Specifically, there is no evidence in the record to show that either STS or Columbia provides any break-bulk and distribution services to the general public.[27] Indeed, the only members of the general public for which such services could be performed are those shippers whose freight has been consolidated with that of a Columbia member and, as to them, there is simply no evidence to support the conclusion that STS or Columbia performs those destination services.[28] If anything, the record sup-

---

26. The Court notes, without deciding, that there is little evidence to support a finding that STS is under the effective control of Columbia. Indeed the record shows that, in actual practice, the two operations are quite separate. See Tr. 95, 96, 276–277, 295–296, 388, 430–431, 547–548, 628. Notwithstanding this serious reservation, however, the Court will proceed on the assumption that STS is under the effective control of Columbia.

27. The Commission specifically noted that "[STS], as agent, purportedly is not involved directly in any break-bulk, or distribution services outside the Philadel-

phia commercial zone." 105 M.C.C. at 849. Nowhere does the Commission or any party rebut that assertion.

28. The Court is aware of the assertion of counsel for plaintiff National Motor Freight Traffic Association that:
"With respect to the consolidation in a single trailer of the LTL freight of STS and a Columbia member the record is clear that STS, being named as the consignee on the rail bill of lading, assumes the responsibility and control of the movement of that shipment to destination. The trailer being under seal, only the consignee, STS,

ports the contrary conclusion that distribution and break-bulk services are performed by separate destination cartage agents of each shipper's own choosing.[29]  Tr. 106, 108.  See also 390.

In addition, the record is clear that the only responsibility assumed by either STS or Columbia for transportation of goods from origin to destination is that assumed by Columbia for movement of its own goods.  Indeed, one of Columbia's circulars to existing and prospective members states:

> "On co-load the responsibility will be that of each association, we will protect our freight and the other association should theirs."  Ex. 3.

There is no evidence to show that that instruction does not apply equally well to non-member, unaffiliated shippers. As to STS, the record shows that STS carries no cargo liability insurance because, as Barnes explained, STS neither has nor assumes any responsibility for goods in transit.  Tr. 143.

In light of the foregoing, there is no support in the record for the conclusion

that Columbia and STS together provide all of the services required of a freight forwarder.[30]  In the absence of such proof, the Commission has no basis upon which to regulate either party and the cease and desist order against Barnes and Columbia cannot stand.[31]

◼ One final matter remains before the Court, namely, the request of plaintiffs (C.A. 3506) Trailer Train, Inc., Expressways Terminals, Inc., and Dominion, Inc., that the Court set aside the order of the Commission, dated February 12, 1968, denying plaintiffs' petitions for leave to intervene in the Commission proceeding.  The petitions having been filed subsequent to the hearings and to the entry of the final Report and Order in this case, the Commission's Rule of Practice 1.73 requires that "good cause" be shown for intervention. Failure to permit intervention under these circumstances is reviewable only for abuse of discretion.

◼ All three petitioners are independent shippers' agents and the reason given in the petitions for interven-

---

can accept that trailer at destination, break the seal, deconsolidate (break-bulk) the respective shipments of the STS customer and Columbia's member, and effect their distribution to the ultimate consignees." Letter to the Court, dated April 22, 1969.
Counsel's statement, however, is unaccompanied by any references to the record and is simply not supported by the record before the Court.

29. There is some confusion in the record as to the exact manner in which the parties provide on the rail waybill for separate handling of consolidated loads at destination.  Barnes (speaking in terms of Plan III piggy-back movements) testified that it was simply a matter of shipping "two trailers on a single flatcar as one rail shipment and nam[ing] one consignee for one trailer and another consignee for another trailer."  Tr. 106. See also Tr. 390.  On brief and at oral argument, however, counsel for Barnes and Columbia explained that, because the Act permits the designation of but one consignee on a waybill, the destination

cartage agents of one of the two joint shippers is designated as consignee but with explicit instructions on the waybill to release the appropriate part of the joint load to the cartage agent designated by the other shipper for separate distribution.  See Tr. Argument, pp. 155–158.  Counsel's explanation is most likely the correct one.

30. A necessary corollary of this conclusion, of course, is that the use by a nonprofit shippers' association of a dependent shippers' agent to co-load with nonmember, unaffiliated shippers is not, by itself, a violation of the Act.

31. The facts outlined above (i. e., failure to provide break-bulk and distribution services and failure to assume responsibility for transportation of non-members' goods (see Ex. 3)) and the legal consequences of those facts also apply in this case to the practice of co-loading with separate shippers' associations, lending additional support to the Commission's approval of that practice.  See n. 20, supra.

tion is their desire to seek review of any determination adverse to their interests. The Court having concluded that the Commission did not decide the question of legality of coloading through independent shippers' agents, no determination adverse to petitioners' interests exists. Accordingly, the Court will not set aside the challenged order.

The foregoing opinion is adopted as the Court's Findings of Fact and Conclusions of Law in accordance with F.R. Civ.P. 52(a), 28 U.S.C.A.

Submit order.

BIGGS, Circuit Judge (concurring).

I concur in the views expressed by my brother WRIGHT but I desire to add the following respecting the issue of coloading or consolidation of Columbia's freight with the freight of non-member, unaffiliated shippers.

The Commission's position can, I think, be fairly summed up as follows: STS is the corporate "alter ego" of Barnes and is "under the effective control of the defendant association [Columbia] and * * * [it] cannot avoid responsibility in connection with the coloading with member traffic for-profit shippers.' * * * " But assuming that these conclusions are correct and fully supported by the record, I still cannot perceive how the Commission avoids the provisions of Section 402(a) (5) (A) which defines a "freight forwarder," *inter alia,* as any person who "assembles and consolidates or provides for assembling and consolidating shipments of * * * property [for transportation], *and performs or provides for the performance of break-bulk and distributing operations with respect to such consolidated shipments * * *.*" (Emphasis added.) I can find no evidence in the record which demonstrates the performance of any "distributing operations". This fact seems to me to destroy the

Commission's case. See the opinion of Commissioner STAFFORD, dissenting in part.

The Commission asserts quite correctly that Barnes "cannot do for * * * [Columbia] what * * * [it] cannot do for itself, and [that] * * * [Columbia] through its direction and control of Barnes, may not use STS as an instrument to expand the scope of its activities to embrace those which would be otherwise permissible under 402(c)." But assuming that Columbia itself performed the coloading services that are done by Barnes or STS, the Commission's conclusion is still invalidated by the phrase of Section 402(a) (5) (A) previously quoted.

The Commission uses Section 402 (c), the "exception" section, as if it prohibited coloading for profit. But even if the coloading here was for profit the Commission is still faced with the same barrier that no break-bulk or distributing operations are demonstrated by the record. I cannot see how the provisions of Section 402(a) (7) are of aid to the Commission's position, for, as stated by Commissioner STAFFORD in dissenting in part, "It is the transportation, not the shippers' primary businesses, which must not be conducted for a profit." True, Section 402(a) (7) provides that the term " 'service subject to this chapter' " means "any or all of the service in connection with the transportation in interstate commerce which any person undertakes to perform or provide as a freight forwarder * * * " but as Commissioner STAFFORD stated, "[T]here is more to forwarding than mere coloading." The Commissioner cites Part IV, Sections 402(a) (5) and (7), of the Interstate Commerce Act to demonstrate the need for complete "forwarding service", which he defines as "break-bulk" and "forwarder responsibility for goods over the entire journey", *i. e.,* from consignor to consignee. I agree.