**METROPOLITAN SHIPPING AGENTS OF ILLINOIS, INC., and Freeman E. Mohry, Plaintiffs,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

**Civ. A. No. 1720–71.**

United States District Court,
D. New Jersey,
Civil Division.
April 27, 1972.

Sheldon Krupnick, New York City, Alan Goldstein, Union, N. J., Isadore Richman, New York City, for plaintiffs.

Seymour Glanzer, I. C. C., Washington, D. C.

Herbert J. Stern, U. S. Atty., by Stephen King, Asst. U. S. Atty., (for the Government), Dept. of Justice, Newark, N. J., for defendants.

Before JAMES ROSEN, Circuit Judge, and AUGELLI and GARTH, District Judges.

## OPINION

GARTH, District Judge:

Plaintiffs sue to set aside, enjoin and annul an order of the Interstate Commerce Commission ordering plaintiffs to cease and desist its operations as a freight forwarder in violation of Section 410(a) of the Interstate Commerce Act.[1] A statutory Three Judge Court was duly empanelled pursuant to 28 U.S.C. § 2325. On January 27, 1972, an order was entered continuing a restraint against the enforcement of the Commission's order pending the final determination by this Court.

Section 402(a) (5) of the Interstate Commerce Act defines the term "freight forwarder."[2] Section 402(c) (2) of the Act contains a "clarifying provision" which, in effect, exempts from the operation of § 401 et seq. a "shippers' agent" whose services and responsibilities to shippers with respect to such op-

---

1. 49 U.S.C. § 1010(a).

2. 49 U.S.C. § 1002(a) (5) reads:
   "The term 'freight forwarder' means any person which (otherwise than as a carrier subject to chapters 1, 8 or 12 of this title) holds itself out to the general public as a common carrier to transport or provide transportation of property, or any class or classes of property, for compensation, in interstate commerce, and which, in the ordinary and usual course of its undertaking, (A) assembles and consolidates or provides for assembling and consolidating shipments of such property, and performs or provides for the performance of break-bulk and distributing operations with respect to such consolidated shipments, and (B) assumes responsibility for the transportation of such property from point of receipt to point of destination, and (C) utilizes, for the whole or any part of the transportation of such shipments, the services of a carrier or carriers subject to chapers 1, 8, or 12 of this title."

erations are "confined to the terminal area."[3] Section 410(a) (1) prescribes that a "freight forwarder" cannot engage in such services unless he first obtains a permit from the Commission.[4]

After extensive hearings, the Commission determined that Metropolitan Shipping Agents of Illinois, Inc. was, in fact, a "freight forwarder" as defined by the Act. Since Metropolitan Shipping was operating without a permit in violation of § 410(a) (1), the Commission ordered plaintiff to cease and desist operations in violation of the Act. Plaintiffs contend that they were operating merely as a "shippers' agent" and thus were under the protective umbrella of § 402(c) (2).

## I.

### (STANDARD FOR REVIEW)

■■ The test of judicial review of an order of the Commission is whether the action of the Commission is supported by "substantial evidence" on the record viewed as a whole. Substantial evidence is "enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." Illinois C. R. Co. v. Norfolk & W. R. Co., 385 U.S. 57, 66, 87 S.Ct. 255, 260, 17 L.Ed.2d 162 (1966); Consolo v. F. M. C., 383 U.S. 607, 621, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966); Smith & Solomon Trucking Co. v. United States, 255 F.Supp. 243 (D.N.J.1966). Moreover, the Commission's order is a product of expert judgment which carries a presumption of validity. Interstate Commerce Commission v. Jersey City, 322 U.S. 503, 513, 64 S.Ct. 1129, 88 L.Ed. 1420 (1944).

■ It is the obligation of this Court to decide whether the conclusion of the Commission that Metropolitan is a

"freight forwarder" within the meaning of the Interstate Commerce Act is based upon "substantial evidence." That this Court might have reached a different conclusion is irrelevant if the Commission's order is based on adequate findings which are warranted in the law and facts under review. Smith & Solomon Trucking Co., *supra*, 255 F.Supp. at 249. See also Columbia Shippers & Receivers Ass'n, Inc. v. United States, 301 F.Supp. 310 (D.Del.1969); Freight Forwarder's Institute v. United States, 263 F.Supp. 460 (S.D.N.Y.1967).

## II.

### (FREIGHT FORWARDER)

It is clear that all the elements of § 402(a) (5) of the Act must be present if Metropolitan is to be within the statutory definition of "freight forwarder." That section sets forth in detail the definition of "freight forwarder," to wit:

"Any person which . . . holds itself out to the general public as a common carrier to transport or provide transportation of property, or any class or classes of property, for compensation, in interstate commerce, and which, in the ordinary and usual course of its undertaking,

(A) Assembles and consolidates or provides for assembling and consolidating shipments of such property, and performs or provides for the performance of break-bulk and distributing operations with respect to such consolidated shipments, and

(B) Assumes responsibility for the transportation of such property from point of receipt to point of destination, and

(C) Utilizes, for the whole or any part of the transportation of such shipments, the services of a carrier or

---

3. "The provisions of this chapter shall not be construed to apply . . . to the operations of a warehouseman or other shippers' agent, in consolidating or distributing pool cars, whose services and responsibilities to shippers in connection with such operations are confined to the terminal

area in which such operations are performed." 49 U.S.C. § 1002(c) (2).

4. "No person shall engage in service subject to this chapter unless such person holds a permit, issued by the Commission, authorizing such service . . . ."

carriers subject to chapters 1, 8, or 12 of this title." 49 U.S.C. § 1002(a) (5).

■ To qualify as a "freight forwarder" one need not actually perform all of the functions authorized under § 402(a) (5). As long as a party *proffers* all of the services described in § 402(a) (5), whether or not performed, it will qualify as a "freight forwarder." National Motor Freight Traffic Ass'n v. United States, 205 F.Supp. 592 (D.D.C. 1962), aff'd. *per curiam*, 371 U.S. 223, 83 S.Ct. 311, 9 L.Ed.2d 273, *rehearing denied but affirmance explained* 372 U.S. 246, 83 S.Ct. 688, 9 L.Ed.2d 709 (1963), *reaff'd.*, National Motor Freight Traffic Ass'n v. United States, 242 F. Supp. 601 (D.D.C.1965).

Therefore, if Metropolitan performs or proffers to the general public and for compensation the services enumerated in § 402(a) (5), then § 410(a) would require that Metropolitan terminate operations until such time that it receives the appropriate "freight forwarder" authorization from the Commission. See Columbia Shippers and Receivers Ass'n, Inc., *supra.*

The present inquiry, therefore, is whether the conclusions of the Commission that there is (1) a proffering, or, performance of, break-bulk and distribution, and (2) an assumption of responsibility are supported by "substantial evidence." [5] We are satisfied that they are.

### III.

### (BREAK-BULK AND DISTRIBUTION)

The Commission found that Metropolitan performed "break-bulk and distributing operations with respect to such consolidated shipments." [6] This deter-

mination by the Commission was based on the following:

a. Metropolitan effectively provides for the *break-bulk* of shipments by instructing the rail carrier to off-load the freight to distributors designated on Metropolitan's shipping documents.[7]

b. Metropolitan notifies distributors of the identity, description, dispatch and destination of the freight. Metropolitan instructs the distributors as to everything concerned with break-bulk and distribution and the distributors take no orders from the shipper. Moreover, there is no substantial contact between the distributors and shippers prior to billing, where such billing is direct. Metropolitan was in the position to direct and control the distributors.[8]

■ With respect to the "break-bulk" requirement, there is substantial evidence in the record to support the Commission's finding. In particular, it appears that the freight bills contained in Exhibits H–4 and H–5 reflect instructions to the rail carrier to off-load the freight to the distributor specified on the respective document. Moreover, the Commission's finding in this respect is supported by the form of a transmittal notice from Metropolitan. (Exhibit H–5, dated November 16, 1967). That notice specifically contains the following instruction:

"Car PFE 452942 is scheduled to arrive Los Angeles P.M., Sunday, Nov. 19th . .

PLEASE REACH OUT FOR THIS CAR FOR PROMPT PLACEMENT AND UNLOADING . ."

With respect to the "distribution of freight" requirement, substantial evidence exists in the record when viewed as a whole to support the Commission's

---

5. There is no dispute that Metropolitan satisfies the requirements of assembly and consolidation, and utilization of a regulated carrier.

6. 49 U.S.C. § 1002(a) (5) (A).

7. REPORT AND ORDER, p. 6.

8. *Id.*

findings. It is implicit in the Commission's Report that the distributors must be instructed by either Metropolitan or the shipper as to the performance of, or provision for, the break-bulk and distribution of freight to the ultimate consignees. Both Metropolitan and the shipper precede the distributor in the chain of distribution of the freight.

The record reveals that on its freight bill Metropolitan designated the name of its own shipper or consignor, the name and address of the designated distributor, and the name and address of the consignee. The freight bill, together with the bill of lading, accompanied the freight throughout its journey to the ultimate destination and served to instruct the distributor as to the provision for break-bulk and distribution to the ultimate consignee. Nowhere in the record does it appear that the *shippers* provided break-bulk and distribution instructions to the distributors. The only evidence in the record is to the effect that break-bulk and distribution instructions were received by the distributor from *Metropolitan* on the latter's shipping documents.

The findings of the Commission are buttressed by the testimony of several witnesses who appeared at the hearing. Oral M. Layman, a shipper witness, testified that apart from delivery of a shipment of freight to Metropolitan, there is no other action taken by the shipper with respect to that freight.[9]

Another shipper witness, one Ken Smargon, testified that he would "call Metropolitan for a pickup the same as any other carrier. That is all we have to do. *Metropolitan makes the arrangements at the other end.*"[10]

Thaddeus Osikowicz testified that all he need do is deliver a shipment of freight to Metropolitan and that Metropolitan "takes care of it." The shipper takes no other action with respect to the shipment.[11]

Additional support for the Commission's findings is found in Exhibit H–3 which is a list of eight west-coast distributors designated by Metropolitan from which a shipper was *required* to select one for distribution of his freight to the consignee. Furthermore, William J. Gray, an experienced investigator for the Commission's Bureau of Operations, testified that the shippers' bills of lading did not show distributors and that the shippers used only those distributors who were designated by Metropolitan.[12]

We therefore conclude that the record when viewed as a whole contains "substantial evidence" to support the finding of the Commission that Metropolitan was effectively performing, or providing for, the break-bulk and distribution operations with respect to the consolidated shipments.

### IV.

### (ASSUMPTION OF RESPONSIBILITY)

■ The Commission found that Metropolitan assumes responsibility for the transportation of the consolidated shipment from the point of receipt to the point of destination.[13] This determination by the Commission was based on the following:

a. The line haul-carrier cannot be responsible to the shipper because the carrier is selected by Metropolitan and no agreement at all exists between the shipper and the line-haul carrier.[14]

b. The record reveals no instances in which a shipper using Metropolitan presented a claim directly to a line-haul carrier or received payment directly from the carrier in satisfaction of a claim. However, shippers have

9. Transcript of Hearing before the Interstate Commerce Commission, Dec. 3, 1970, at 63. [Hereinafter transcript references shall be designated Tr.]

10. Tr. 79 (emphasis added).

11. Tr. 102.

12. Tr. 33.

13. 49 U.S.C. § 1002(a) (5) (B).

14. REPORT AND ORDER, pp. 6–7.

received payment of claims from Metropolitan on the latter's checks.[15]

c. The evidence shows that the shippers have no contact with distributors until the bills for services are submitted, if then. The distributors are accountable only to Metropolitan and obey the latter's instructions and report the disposition of freight to Metropolitan only. Metropolitan has the right to direct and control distribution of freight and is accountable to the shipper for the exercise of that control.[16a]

Based upon the above findings of fact the Commission concluded that Metropolitan is accountable to the shipper for the transportation performed by the line-haul carrier and the distributor.

A review of the record reveals no evidence to indicate that either the line-haul carrier or distributor was responsible to the *shipper* for its respective part of the transportation of freight originally tendered by the shipper to Metropolitan. In addition, there is affirmative evidence in the record to the effect that shippers believed they were receiving from Metropolitan the full services of a "freight forwarder," including the assumption of responsibility for the transportation of the freight shipments to their ultimate destination.

Oral M. Layman further testified that two separate claims for loss or damage were filed on the shipper's standard claim form against *Metropolitan.* Moreover, he stated that ". . . when the claim was settled it was on [Metropolitan's] check that such claim was paid." [17]

Ken Smargon also testified with respect to loss or damage claims that these claims " . . . were directed against Metropolitan . . ." and that ". . we were paid for these claims by them." [18]

We conclude that the affirmative testimony in the record and the absence of any evidence of accountability of the line-haul carriers and distributors to the shippers using Metropolitan is sufficient to support the Commission's findings under the standard heretofore enunciated.

## V.

### (WEIGHT AND CREDIBILITY)

Many of plaintiffs' contentions go to the weight and credibility of the testimony adduced before the Commission. It is the exclusive function of the Commission to appraise conflicting testimony or other evidence, to judge the credibility of witnesses and evidence adduced by the parties and determine the weight of the evidence. Alabama Highway Express, Inc. v. United States, 241 F.Supp. 290 (D.Ala.), aff'd., 382 U.S. 106, 86 S.Ct. 255, 15 L.Ed.2d 190 (1965); W. J. Dillner Transfer Co. v. United States, 277 F.Supp. 420 (W.D.Pa.1967).

For the reasons hereinabove expressed, the Order of the Interstate Commerce Commission be and the same is hereby affirmed.

An appropriate order shall be submitted.

15. *Id.* at p. 7.

17. Tr. 58.

18. Tr. 84.