**NATIONAL FREIGHT, INC., Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants,**
and
**Curtis, Inc., Intervener.**

**Civ. A. No. 1716–72.**

United States District Court,
D. New Jersey.

June 13, 1973.

**1154**

Billig & Jones, P. C. by Jacob Billig, Washington, D. C., for plaintiff.

Herbert J. Stern, U. S. Atty., by William A. Carpenter, Asst. U. S. Atty., for the United States.

James F. Tao, Washington, D. C., for I. C. C.

Fox & Fox, by Arthur D. Grossman, Newark, N. J. (Frederick Coffman, Lincoln, Neb., Nebraska Bar—of counsel), for Curtis, Inc.

## OPINION

Before GIBBONS, Circuit Judge, and FISHER and LACEY, District Judges.

CLARKSON S. FISHER, District Judge.

This is an action by a motor carrier, National Freight, Inc. of Vineland, N. J. (hereinafter National), to set aside, enjoin and annul an order of the Interstate Commerce Commission denying National's application for authority to transport meats and meat products after a hearing examiner had determined that such authority should have been granted.

A statutory Three-Judge Court was empanelled and statutory jurisdiction has been established pursuant to 28 U. S.C. Secs. 1336, 1398, 2284, 2321–2325 and 49 U.S.C. Sec. 305(g) and (h).

National seeks a certificate of public convenience and necessity under the Interstate Commerce Act, 49 U.S.C. Sec. 307, for authority to transport, over irregular routes, meats and meat products from the facilities of two shippers at

Lincoln, Nebraska and Denver, Colorado to points in the mid-Atlantic and New England states. Two shippers, American Stores Packing Co., a division of Acme Markets, Inc. located at Lincoln, Nebraska, and United Packing Co., a division of Food Fair Stores, Inc. located at Denver, Colorado, requested National's services and supported its application because they were dissatisfied with rail "piggyback" service.

National alleges that the Commission's disposition of its application, styled as National Freight, Inc., Extension-Meats, Docket No. MC–2860 (Sub. No. 87), has been arbitrary, capricious and an abuse of administrative discretion. National contends that:

(1) The actions of the Commission are unsupported by substantial evidence on the administrative record viewed as a whole as required by Section 10 of the Administrative Procedure Act, 5 U.S.C. Sec. 706;

(2) The Commission's denial of National's application lacks rational conclusions supported by adequate findings as required by Section 8(b) of the Administrative Procedure Act, 5 U.S.C. Sec. 557(c);

(3) The Commission erroneously interpreted the legal standards necessary to determine the public convenience and necessity under the Interstate Commerce Act, 49 U.S.C. Sec. 307.

**I**

National filed its application with the Commission on October 6, 1970, which was then referred to a hearing examiner. A hearing was held on July 15, 1971 in Denver, Colorado. At the conclusion of the hearing, the examiner ruled that the application should be granted,[1] because to him the application seemed to present no substantial difficulties. Pursuant to 49 C.F.R. Sec. 100.247(i) the hearing examiner directed National's counsel to submit a proposed report and order.[2] Counsel complied with this direction on August 9, 1971. On August 31, 1971 the hearing examiner issued a report and recommended order that the application be granted.[3]

However, on March 23, 1972 the report and order of Review Board Number 3 of the Commission [4] reversed the hearing examiner's determination and recommended that the application be denied. The Review Board found the hearing examiner's statement of facts to be "substantially correct" and only modified them slightly.[5] It is this six-page report that National contests as error by the Commission.

On May 1, 1972 National petitioned the Commission for reconsideration of the Review Board's decision. National also requested to reopen the administrative record to admit the verified statement of its vice-president, Edmund T. De Felippis. On July 18, 1972 Division 1 of the Commission, acting in an appellate capacity, denied National's requests and affirmed the decision of the Review Board. In its one-page order the Commission specifically noted that the De Felippis statement, even if received, would not "warrant a result different than that already reached by the Board".[6] National petitioned the Com-

1. Transcript of hearing before Daniel J. Davidson, Hearing Examiner of the Interstate Commerce Commission, July 15, 1971, at 189. (Hereinafter transcript references will be designated Tr.).

2. Tr. 189–190.

3. The Commission's counsel has urged that the hearing examiner's findings are "tainted" because they are substantially the product of National's counsel. Such an argument is obviously without merit.

4. The Review Board is an employee board of the Commission. Its decisions are sub-

ject to review by a division of or the Commission itself if an application for rehearing, reargument or reconsideration is made by any dissatisfied party. 49 U.S.C. Sec. 17(6).

5. Report and Order of Review Board Number 3 of the Commission, March 23, 1972, at 3. (Hereinafter report references will be designated R.).

6. Counsel for the Commission argues that the De Filippis affidavit cannot be considered by this Court because it was not formally admitted into the record by the

mission for further review which was denied on August 29, 1972.

## II

 The scope of judicial review of an order of the Commission is restricted. This Court can only consider whether the action of the Commission is supported by "substantial evidence" on the record viewed as a whole. Substantial evidence is "enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury". Metropolitan Shipping Agents of Ill., Inc. v. United States, 342 F.Supp. 1266, 1268 (D.N.J.1972) and cases cited therein. The Commission's order carries a presumption of validity because it is the product of expert judgment. *Metropolitan, supra* at 1268, citing Interstate Commerce Commission v. Jersey City, 322 U.S. 503, 513, 64 S.Ct. 1129, 88 L.Ed. 1420 (1944). When reviewing an application for a certificate of public convenience and necessity concerning extension of services, this Court cannot substitute its view concerning what should be done for that of the Commission. United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 536, 66 S.Ct. 687, 90 L.Ed. 821 (1946). That this Court might have reached a different result is irrelevant if the Commission's order is based upon adequate findings which are warranted in the law and facts under review. *Metropolitan, supra,* 342 F.Supp. at 1268 and cases cited therein. Finally, the requirement that the Commission's decision be fully supported by adequate findings "is satisfied if the report of the Commission, read as a whole, discloses the essential basis of the decision". Soo Lines Railroad Co. v. United States, 271 F.Supp. 869, 872 (D. Minn.1967). Given these legal standards, this Court must determine whether the Commission's denial of National's application is rational and based upon adequate findings supported by substan-

tial evidence on the record viewed as a whole.

## III

 National's application was made pursuant to Section 207(a) of the Interstate Commerce Act, 49 U.S.C. Sec. 307(a), which provides in pertinent part:

"Subject to section 310 of this title, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operations covered by the application, if it is found that the applicant is fit, willing, and able properly to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, to the extent to be authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. . . ."

Under this statute the Commission has broad and exclusive discretion to determine public convenience and necessity. Interstate Commerce Commission v. Parker, 326 U.S. 60, 65, 65 S.Ct. 1490, 89 L.Ed. 2051 (1945). This discretion ultimately belongs to the Commission and not to the hearing examiners. Braswell Motor Freight Lines, Inc. v. United States, 275 F.Supp. 98, 103 (W.D.Tex. 1967), aff'd, 389 U.S. 569, 88 S.Ct. 692, 19 L.Ed.2d 779, reh. denied, 390 U.S. 975, 88 S.Ct. 1025, 19 L.Ed.2d 1194 (1968); *cf.* United States v. Pierce Auto Freight Lines, *supra.* But whatever action the Commission takes, there must be "warrant in the law and the facts for what the Commission has done". *Pierce Auto, supra,* 327 U.S. at 536, 66 S.Ct. at 698.

## IV

In this case, the record discloses two essential bases given by the Commission

Commission. This argument is without foundation in view of the Commission's own admission that after having reviewed this statement the matters discussed therein would not affect the outcome.

for reversing the hearing examiner's conclusions. First, the Review Board finds that the existing services of Curtis, Inc.,[7] an irregular motor common carrier with headquarters at Denver, Colorado, are adequate to service the needs of these two shippers because Curtis is in a "better position" to provide such service.[8] Second, the Review Board finds that National has not demonstrated any "reasonable" or "feasible" plan [9] to meet the east-bound transportation needs of these shippers, primarily because National has failed to show that it terminates enough west-bound equipment close to either Denver, Colorado or Lincoln, Nebraska so that equipment would readily be available to take the meat to the east coast of the nation.

It is important to note that these shippers require a particular type of transportation service known in the trade as "peddle service".[10] Peddle service is a method used to reduce warehouse handling and transferring of meat into different vehicles which results in loss of freshness and quality. For example, a National trailer would be loaded with the first store-door delivery stop loaded on last. An over-the-road driver would bring it to the nearest National terminal on the eastern seaboard where a different tractor and local driver would take over the trailer and continue on to make door stops at each Food Fair store near that terminal. Utilizing this peddle service technique, the meat is loaded and unloaded only once to pre-

serve its quality. With respect to peddle service, the record reveals that Food Fair believes National Freight to be "very effective" because it has provided such service in the eastern area for perishables and dry freight of Food Fair for four or five years and because Food Fair considers National to be "food-industry oriented" and "very cognizant" of their requirements for fast and dependable service.[11] Acme expressed a similar confidence in National's peddle service based upon National's previous service to it for other perishable commodities.[12] On the other hand, Curtis has provided peddle service for Food Fair and other shippers to the west coast, mostly to California.[13] Curtis had an east coast terminal in New Jersey in 1971 and has made very few shipments to stores in the east.[14]

But the two shippers in this case clearly require an eastern-based carrier to provide such specialized peddle service primarily because of the advantage of a carrier with a number of eastern facilities, equipment and local drivers familiar with east coast store locations.[15] The hearing examiner utilized this evidence to reach the fairly obvious conclusion that National rather than Curtis could better serve the eastern peddle deliveries of these shippers.[16] The Review Board Report merely asserts that Curtis is "in a better position" to meet the "eastbound transportation needs" without revealing any substantial facts or specific findings in favor of such a conclusion,[17]

7. Curtis, Inc. appeared in the proceedings before the Commission as the sole protestant against National Freight's application. In this action Curtis has been permitted to intervene as a party defendant under F.R.Civ.P. 24(a) and 28 U.S.C. Sec. 2323.

8. R. 6.

9. R. 5, 6.

10. Tr. 56, 118.

11. Tr. 61.

12. Tr. 120–121, 132.

13. Tr. 177, 186.

14. Tr. 134, 180–183. Curtis has transported Food Fair meats to eastern warehouses in the past (Tr. 62–63), but it is evident from the record that Curtis failed to offer any evidence to establish that it provides the type of east-coast peddle delivery service that these shippers require. Tr. 183.

15. Tr. 62, 121, 130.

16. Report and Order recommended by Daniel J. Davidson, Hearing Examiner of the Interstate Commerce Commission, August 31, 1971 at 5, 8–9. (Hereinafter report references will be designated Sheet).

17. R. 6–7.

**1158**

even in view of the particularized need for eastern peddle service.[18]

■ We need not reach the argument of National that the Commission's use of a "better position" test is an erroneous legal standard under the statutory requirement of public convenience and necessity because it is a generally accepted principle that the criteria by which the Commission chooses to make determinations of public convenience and necessity may not be reviewed or criticized by this Court unless they are found to be capricious or irrational. Midwest Emery Freight System, Inc. v. United States, 293 F.Supp. 403, 405 (D.Ill.1968); Greyhound Lines, Inc. v. United States, 285 F.Supp. 318, 321 (D.Ill.1968); United Van Lines, Inc. v. United States, 266 F.Supp. 586, 589 (D.Mo.1967). More importantly, the record as a whole shows substantial evidence that, as the hearing examiner determined, National rather than Curtis is better equipped to provide peddle service in the eastern seaboard states, especially in view of National's past history of effective peddle delivery of other perishable commodities in these eastern areas and the east coast orientation of its drivers. The Commission's findings and conclusions that Curtis can better provide peddle delivery along the east coast are not supported by substantial evidence on the record viewed as a whole. Thus, the first basis of the Commission's denial is without substantial factual foundation in the administrative record.

The second basis for the Commission's denial of National's application, that National has no feasible plan of operations because it does not terminate enough trucks close to Denver or Lincoln, presents a more difficult issue to resolve. The Review Board found that National's west-bound authority for perishables "generally terminates between 400 and 800 miles *east* of the two sought origins".[19] While National's closest terminal to these origins appears to be Waxahachie, Texas,[20] the record reveals that National does have authority to truck perishable commodities into several mid-western states.[21] In fact, the record clearly indicates that National has this authority into Nebraska, where Lincoln is located and which borders Colorado.[22] National is also authorized to serve the entire State of Kansas which is adjacent to both Nebraska and Colorado. Both Iowa and Missouri, which border Nebraska, can be served by National. Thus, the Commission's factual finding that National's west-bound authority for perishables generally terminates between 400 and 800 miles east of Lincoln and Denver is erroneous and not supported by substantial evidence. Even though National did not show the specific number of trucks terminating in these states, the Commission's finding with respect to the west-bound authority of National remains unsupported.

■ National argues that the Commission's conclusion of unfeasibility is erroneous because the record shows that even if vehicles terminate more than 400 miles from Lincoln or Denver, they can be efficiently dispatched to pick up the shippers' east-bound loads of meat by use of National's telephonic central dispatch system. The Report of the Review Board does not discuss this dispatch system's effectiveness even though the record shows National's well-placed

18. At oral argument counsel for the Commission urged the correctness of the Commission's denial because the record revealed no public need for the proposed service as required by Sec. 307(a). The problem here, of course, is that the record does not reveal any finding by the Commission of no public need. Under the Administrative Procedure Act it is clear that if this were the reason for the Commission's denial, error has occurred because the Commission did not make any findings nor conclusions based upon this claim.

19. R. 5.

20. Tr. 27.

21. Tr. 14–16; Appendix B, Plaintiff's Brief.

22. Tr. 15–16.

reliance on that system for nearly all its Midwest operations.[23] National also contends that it will "deadhead"[24] vehicles to these origin points when necessary and that because such "deadheading" has been permitted in other cases in the past by the Commission over great distances,[25] the use of the "deadhead" technique alone cannot render a proposed plan of operations unfeasible. Indeed, Curtis' own vice-president admitted that it is not possible to "have a terminal at every shipping point",[26] which implies that necessarily every motor carrier must, to some extent, send empty vehicles from one point to another to pick up cargo.

The difficulty with the Commission's denial of National's application on the ground that National does not "generally terminate" the requested seventy-five refrigerated vehicles per week in the Lincoln or Denver vicinities is that in reaching this conclusion the Commission makes no findings nor attempts any reasoning with respect to National's proposals in the record to utilize its telephonic dispatch system and to "deadhead" vehicles. The Commission merely concludes that because National did not, at the time of its application, terminate seventy-five trucks in those areas, there was no "feasible" means for National to get vehicles to Lincoln or Denver in spite of substantial evidence offered by National to the contrary. In view of National's proposals on the record, it is difficult to determine how the Commission reached its conclusion of denial without any findings with respect to these proposals. Apparently the hearing examiner relied upon the evidence of these proposed methods when he determined that National "has refrigerated

equipment terminating in the mid-west which could be utilized for the transportation of the involved traffic".[27] It is most difficult for this Court to discern the basis for the Commission's reversal on this point without specific findings and rational conclusions based upon substantial evidence in the record. In our opinion, it was error for the Commission to reach such a conclusion without specific findings or rational reasons based upon substantial evidence in the record.

■ Based upon our examination of the entire record, it is the opinion of this Court that the Commission's findings that Curtis is in a "better position" and that National Freight has no "feasible" plan because it does not generally terminate enough trucks in the origin areas are erroneous because they are not supported by adequate subsidiary findings nor by substantial evidence on the record as a whole.

■ Although the erroneous findings and reasons advanced by the Commission cannot be utilized to deny National's application for a certificate of public convenience and necessity, it would be inappropriate for this Court to speculate what other theories might support a denial based upon the record before us. *See* Arrow Line, Inc. v. United States, 256 F.Supp. 608, 612 (D.Conn. 1966). That is a function explicitly reserved by Congress for the expertise of the Commission. Because of these errors, we are unable to express an opinion as to whether the Commission's denial might be supported by other reasons based upon substantial evidence on this record viewed in its entirety. Any attempt by the Court at this stage of the proceedings to decide whether National's application ultimately should be

23. Tr. 45–46.

24. To "deadhead" a vehicle is to transport it from point A to point B without cargo in order to pick up cargo at point B for delivery to another destination. Here, for example, National apparently proposes for a west-bound truck after delivering perishables to Kansas to go from Kansas to Denver, Colorado to pick up

meats for eastern destinations. The trip from Kansas to Denver without cargo would be a "deadhead" run.

25. *See* Refrigerated Transport Co., Inc. Ext.—Frozen Foods, 72 M.C.C. 459, 461 (1957).

26. Tr. 148.

27. Sheet 8.

granted or denied would usurp the proper functions of the Commission. This case, then, must return to the Commission for the exercise of its lawful discretion to determine the public convenience and necessity.

Accordingly, the Commission's order denying plaintiff's application is vacated. The case is remanded to the Commission for further proceedings consistent with this opinion.