**MIDWESTERN TRANSPORTATION, INC., Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

**Graves Truck Line, Inc., Intervenor.**

**No. 79–1461.**

United States Court of Appeals, Tenth Circuit.

Argued Sept. 18, 1980.

Decided Nov. 26, 1980.

Jack L. Coke, Jr., of Phinney, Hallman, Pulley & Coke, Dallas, Tex. (Robert E. Warren, Jr., of Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo., with him on the brief), for petitioner.

Timm L. Abendroth, Atty., I. C. C. (John H. Shenefield, Asst. Atty. Gen., Robert B. Nicholson and Robert Lewis Thompson, Attys., Dept. of Justice, Richard A. Allen, Gen. Counsel, Henri F. Rush, Associate Gen. Counsel, and Ellen K. Schall, Atty., I. C. C., Washington, D. C., on the brief), for respondents.

Larry E. Gregg, Topeka, Kan. (John E. Jandera, Topeka, Kan., on the brief) of Jandera & Gregg, Topeka, Kan., for intervenor Graves Truck Line, Inc.

Before McWILLIAMS and BARRETT, Circuit Judges, and TEMPLAR, District Judge *.

BARRETT, Circuit Judge.

This petition for review filed by Midwestern Transportation, Inc., hereinafter referred to as "Midwestern", challenges a decision of the Interstate Commerce Commission (ICC) granting a certificate of public convenience and necessity to Graves Truck Line, Inc., hereinafter referred to as "Graves", to transport general commodities between Oklahoma City, Oklahoma, and Amarillo, Texas, over Interstate Highway 40. Our jurisdiction is conferred pursuant to 28 U.S.C. §§ 2341 and 2342, as amended January 2, 1975, P.L. 93 584, Sec. 3, 88 Stat. 1917.

This proceeding was initiated in June, 1977, when Graves filed its application seeking a certificate of public convenience and necessity to transport general commodities directly between Oklahoma City and Amarillo over Interstate Highway 40, serving no other intermediate points. At the time it filed the application, Graves held a certificate for authority to transport general commodities over specific routes between Oklahoma City, Tulsa, Ponca City, Oklahoma, and Amarillo, Texas. Insofar as the record reflects, Graves has not abandoned this certificate.

Under its original certificate, Graves has no direct route between Oklahoma City and Amarillo. It is required to travel some 357 miles to reach Amarillo from Oklahoma City. The instant application was for a direct route via Interstate Highway 40 covering some 258 miles, constituting a mileage difference of 30 percent. Graves estimated, without contradiction, that it would save some two hours driving time each trip and about 11,440 gallons of fuel per year. The hearing on the application was conducted by an Administrative Law Judge (ALJ) at Oklahoma City, July 24–26, 1978. Two competing common carriers, Midwestern and Texas Oklahoma Express, Inc. (TOX) appeared in opposition. Some seven shippers appeared in support thereof.

The ALJ found that: The existing service rendered by Graves, with both regular and irregular route authorities, serves many intermediate locations on the regular routes (extending between Oklahoma City, Tulsa, Lawton, and Ponca City, Oklahoma, on the one hand, and Amarillo, Texas, on the oth-

* Of the United States District Court for the District of Kansas, sitting by designation.

er); none of the existing routes extend directly to Amarillo; under the existing certificate, Graves, in cases of less–than–truckload shipments, delivers shipments gathered at Tulsa, Tonkawa (near Ponca City), Lawton and other Oklahoma points and combines them with traffic collected at Oklahoma City, which in turn is moved circuitously from Oklahoma City to · and through many other points in Oklahoma and Booker, Perryton and Pampa, Texas, ultimately to Amarillo, Texas; the issuance of the direct route certificate to Graves would enable both Graves and the shippers to keep costs down and shorten transit time; and, if the application be granted, traffic currently awarded to Midwestern and TOX would not be diverted to Graves.

The ALJ concluded that the public convenience and necessity required the operations proposed by Graves. The ALJ acknowledged that only a few complaints had been registered against the existing services of Midwestern and TOX, which were undocumented and remote, and that there are presently twelve motor common carriers with authority to transport general commodities over regular (direct) routes between Oklahoma City and Amarillo. The basic thrust of the ALJ's conclusion was predicated upon the substantial cost benefits to Graves and, eventually, to the shipping public, "... without any significant adverse effect upon the protestants." [Joint Appendix, Vol. I, p. 101]. The ALJ found that substantial cost savings would accrue to Graves from operation over the short route applied for, and would, in effect, place Graves in the proximate position of the protestants who likewise depend upon the Oklahoma–Amarillo traffic to service smaller points in Oklahoma and Texas. On this predicate, the ALJ ruled:

Accordingly, the application requires a balancing of the benefits that would flow to the shipping public from giving appli-

cant a more efficient operation between Oklahoma City and Amarillo, on the one hand, and, on the other, the detriment to the shipping public resulting from a reduction in the efficiency of protestants' operations due to a diversion of some of their traffic to applicant. Here too, it must be kept in mind that presently there are at least 12 general freight carriers conducting operations in the Amarillo–Oklahoma City corridor.

In my opinion, the balance weighs heavily in applicant's favor. The cost and fuel savings which Graves can realize from a grant of authority are unquestionably substantial, even without the diversion of a single pound of freight from protestants. Moreover, assuming that applicant could add significantly to its volume of traffic between the involved points, it would have to do so in the face of competition from 12 carriers, not just the two protestants. Reasonably, such traffic as might be diverted would be spread among the various carriers. At least, those with adequate service, such as protestants, would have less to fear than those other carriers not appearing here whose service may not be as good. In the circumstances, it is concluded that the operations of protestants will not be materially adversely effected by a grant of the sought authority and that the need for more efficient service by applicants overrides the possible adverse effect that such service may visit upon protestants. [R., Joint Appendix, Vol. I, p. 101].

Exceptions were filed to the decision of the ALJ, to which Graves replied. The ICC, through Div. I, affirmed the findings, conclusions and statement of facts of the ALJ and ordered the Graves application granted.[1] [Joint Appendix, Vol. I, pp. 145, 146].

Midwestern contends that inasmuch as Graves' application was filed as a regular

---

1. Commissioner Clapp concurred in part and dissented in part. He would grant Graves the alternate rather than a service route. He stated:

In applicant's reply to Protestants' exceptions it relies solely on the alternate route

theory to support its application, and this reliance is, I believe, borne out by the evidence. On the other hand, there is minimal evidence of need for a new service route between Amarillo and Oklahoma City.

route application, it was improperly prosecuted and treated by Graves, the ALJ and Div. I of the ICC as an alternate route application. Graves, in its brief as Intervenor, acknowledges that it filed a regular route application, but asserts, in response, that the evidence in the record fully satisfies the criteria to be applied in alternate route theory cases. [Brief of Intervenor, pp. 9–15].

The issue thus presented involves the criteria governing a regular service route application compared to an alternate route application and the burden of proof connected with each.

## I.

It is initially important, we believe, to delineate the scope of our review. The Administrative Procedure Act, 5 U.S.C. § 706(2) provides, *inter alia*, that a reviewing court shall set aside agency action if determined to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law or unsupported by substantial evidence on the record as a whole.

■ The ICC's interpretations of its regulations and the facts supporting a grant or denial of a certificate require recognition of its expertise and our deference thereto. *Koppel, Inc. v. United States*, 612 F.2d 1264 (10th Cir. 1979). We there favorably quoted from *Dunkley Refrigerated Transport, Inc. v. United States*, 416 F.Supp. 814 (D.Utah 1976) in part, as follows:

A court will uphold the decision of an independent governmental agency, such as the I.C.C., if the decision is within the agency's statutory powers and is supported by adequate findings that are based upon "substantial evidence." *E. g., Illinois Central Railroad v. Norfolk & Western Railway*, 385 U.S. 57, 87 S.Ct. 265, 17 L.Ed.2d 162 (1966); *United States v. Pierce Auto Freight Lines*, 327 U.S. 515, 535–36, 66 S.Ct. 687, 697–98, 90 L.Ed. 821 (1946); *Dunkley Refrigerated Transport, Inc. v. United States*, 253 F.Supp. 891, 892 (D.Utah 1966). "Substantial evidence" is normally defined as " 'such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.' ... '[E]nough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.' ... [T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). The court cannot inquire into the wisdom of the decision. The agency's findings must be accepted if, after looking at the record as a whole, the court finds that they are supported by substantial evidence. *E. g., United States v. Pierce Auto Freight Lines, supra*, 327 U.S. at 535-36, 66 S.Ct. at 697-98. Furthermore, there is a presumption in favor of the validity of I.C.C. orders and the plaintiff bears the burden of showing the invalidity of the order. *I.C.C. v. City of Jersey City*, 322 U.S. 503, 512–13, 64 S.Ct. 1129, 1133-34, 88 L.Ed. 1420 (1944). If the plaintiff can meet its burden of showing that the Commission's orders are not based on substantial evidence, the court will remand the case to the I.C.C. for a proper determination. *National Freight, Inc. v. United States*, 359 F.Supp. 1153 (D.N.J.1973).

612 F.2d at p. 1269.

With the above standards of review guiding us, we now turn to the merits of the case.

## II.

Midwestern argues that: (a) the decision of the ICC "clearly reflects" the erroneous attempt to apply alternate route criteria to the facts of record found by the ALJ and the ICC, (b) the findings and conclusions forestall, as a matter of law, the grant of authority based upon alternate route theory, and (c) neither the alleged economy of operation nor the increase of competition forms a legal basis which will sustain the arbitrary and capricious decision of the ICC on a regular service route theory.

ICC contends that alternate route criteria and theory is not applicable but that regular service route theory is. Midwestern ultimately, however, argues that the decision of the ICC may not be sustained on the basis of either alternate route theory or regular service route theory; that the findings and conclusions of the ICC are wholly insufficient to justify the subject grant of operating authority to Graves on any theory. [Reply Brief of Midwestern, p. 3]. The ICC's response contends that its grant of a direct route certificate to Graves between Oklahoma City and Amarillo benefits the public far more than it works to the detriment of existing carriers in that the evidence discloses: the direct route over Interstate 40 enables Graves to maximize fuel efficiencies while lowering cost; fuel efficiency and operating economy are goals mandated by the National Transportation Policy; the proposed Graves service will not have a material adverse effect on the operations of Midwestern and TOX; while Graves may be able to capture new traffic as a result of its efficient service, Midwestern will not necessarily be the loser, inasmuch as there are twelve carriers serving within the Amarillo–Oklahoma City corridor and only those rendering inadequate service need fear competition from Graves. In conclusion, ICC argues that although Midwestern would like to maximize its revenues, the Commission is not bound to protect existing carriers from competition; rather, the ICC must ensure that the public receives good service at reasonable costs, and the Graves application is completely consistent with that overriding policy. [Brief of ICC and the United States, pp. 8, 9].

### A.

On October 17, 1978, the President signed P.L. 95–473, 92 Stat. 1337, which revised, codified, enacted and reenacted provisions of the Act in the 1978 reorganization of the Interstate Commerce Act and related laws. The ICC affirmed the decision of the ALJ in this case on March 28, 1979. The statutes applicable to this review are:

49 U.S.C. § 10922, formerly Section 207(a) of the Interstate Act, which provides as follows:

(a) Except as provided in this section and 10930(a) of this title, the Interstate Commerce Commission shall issue a certificate to a person authorizing that person to provide transportation subject to the jurisdiction of the Commission under subchapter II or III of chapter 105 of this title as a motor common carrier or water common carrier, respectively, if the Commission finds that-

(1) the person is fit, willing, and able—

(A) to provide the transportation to be authorized by the certificate; and

(B) to comply with this subtitle and regulations of the Commission; and

(2) the transportation to be provided under the certificate is or will be required by the present or future public convenience and necessity.

49 U.S.C. § 10101, Transportation Policy, which provides:

(a) To ensure the development, coordination, and preservation of a transportation system that meets the transportation needs of the United States, including the United States Postal Service and national defense, it is the policy of the United States Government to provide for the impartial regulation of the modes of transportation subject to this subtitle, and in regulating those modes—

(1) to recognize and preserve the inherent advantage of each mode of transportation;

(2) to promote safe, adequate, economical and efficient transportation;

(3) to encourage sound economic conditions in transportation, including sound economic conditions among carriers;

(4) to encourage the establishment and maintenance of reasonable rates for transportation without unreasonable discrimination or unfair or destructive competitive practices;

(5) to cooperate with each State and the officials of each State on transportation matters; and

(6) to encourage fair wages and working conditions in the transportation industry.

(b) This subtitle shall be administered and enforced to carry out the policy of this section.

On October 19, 1979, in apparent recognition of the broad scope of 49 U.S.C. § 10101, *supra*, the ICC published a policy statement, 44 Fed.Reg. 60,296, which eliminated from its "public convenience and necessity" criteria consideration of the *adequacy of existing service*. Prior thereto, the guidelines by which the ICC decided the "public convenience and necessity" issue were those laid down in *Pan American Bus Lines Operation*, 1 M.C.C. 190, 203 (1966): (1) whether the new operation will serve a useful purpose responsive to a public need or demand, (2) whether the purpose can be properly served by existing carriers and (3) whether it can be served by the applicant without impairing the operations of competing carriers contrary to the public interest. One court has pertinently stated that the criteria laid down in *Pan American, supra*, is to be treated as a "guideline, not a strait jacket." *Appleyard's Motor Transp. Co., Inc. v. Interstate Commerce Commission*, 592 F.2d 8, 11 (1st Cir. 1979).

■ A finding by the ICC that existing motor carrier service is inadequate is not required prior to grant of new authority. *United States v. Dixie Highway Express, Inc.*, 389 U.S. 409, 88 S.Ct. 539, 19 L.Ed.2d 639 (1967). And, in an evidentiary sense, the Supreme Court made it clear in *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) that:

> The issue before the Commission was not whether the appellees' service [of protesting carriers] met some absolute standard of performance but whether 'public convenience and necessity' would be served by the entry of new carriers into the markets served by appellees . . .
> 419 U.S. at p. 288, 95 S.Ct. at 443.

■ The ultimate decisional criteria, in our view, is whether the interest of the public, rather than the economic advantages of competing carriers can be served by the grant of authority. *Hilt Truck Line v. United States*, 532 F.2d 1199 (8th Cir. 1976). This, in turn, requires a holding that the *evidence in the record* is supported by adequate findings based upon substantial evidence. We hold that this record does comport with those demands.

■ We observe that while attacking the grant of the certificate to Graves on the basis that it (Graves) had not met the criteria required for the proof of a regular service route [Reply Brief of Midwestern, p. 1], no contention is advanced that the protestants would have offered any other or further evidence in opposition. In any event, in our view, Graves did meet the criteria. The application was filed as a regular service route application, but was essentially prosecuted as an alternate route application. Even though Commissioner Clapp, in dissent, stated that he would have granted an alternate route rather than a direct service route, all three commissioners agreed that the authority should be granted. In *Cooper's Express, Inc.*, 51 M.C.C. 411 (1950) the Commission discussed the burden of proof required in an alternate route application as distinguished from a new service route:

> We have consistently recognized a distinction between the measure of proof required to sustain the granting of an application seeking authority to improve an existing and competitively effective service and one seeking authority to institute a new service. In determining these so-called alternate route applications, the essential issue presented is whether applicant actually engaged in the transportation of traffic, in substantial volumes, between the termini of the proposed alternate or direct route and is at present in a position effectively to compete with other carriers for such traffic, or whether the new route will enable applicant either to institute a new service not theretofore conducted, or to institute a service so different from that theretofore provided as materially to alter the competitive situation to the injury of existing carriers.

In the case of the former, we are justified in granting the authority sought solely upon proof that the proposed operation would result in operating economies, which, although primarily a benefit to the applicant, result in an indirect benefit to the public through the medium of more efficient service.

[51 M.C.C. at p. 414].

In *Cooper's, supra,* as here, the ICC recognized that the applicant: had been handling traffic between the involved terminals for some time; had maintained terminal facilities at both points; had actively solicited business between the terminals; had handled substantial traffic between the terminals; and would, if the application be granted, realize substantial savings in operating expenses and transit time.

### B.

We have heretofore observed that the National Transportation Policy, 49 U.S.C. § 10101(a)(2) mandates regulation of modes of transportation so as "to promote safe, adequate, economical, and efficient transportation." In *May Trucking Company v. United States,* 593 F.2d 1349 (D.C.Cir.1979), the Court observed that the Congress designed the Interstate Commerce Act to benefit people, not to create protective monopolies for those who profess to serve the public, and injury to existing carriers by reason of competition is relevant only when that competition serves to injure the public.

The ICC has been charged with the duty of responding to the dynamic character of the nation's transportation problems. *Interstate Commerce Commission v. Appleyard,* 513 F.2d 575 (4th Cir. 1975), *cert. denied,* 423 U.S. 840, 96 S.Ct. 72, 46 L.Ed.2d 60 (1975). The words "route" and "routes" are manifestly used to signify the highways where the motor vehicles operate and not the areas between the terminal points, and the regulation of carriers entrusted to the ICC permits the Commission's designation of routes in the public interest. *Consolidated Freightways, Inc. v. United States,* 136 F.2d 921 (8th Cir. 1943), *cert. denied,* 320 U.S. 781, 64 S.Ct. 188, 88 L.Ed. 469 (1943).

While a reviewing court cannot interfere with discretionary functions vested in a governmental agency, the court must require the agency to adhere to its own pronouncements or explain its departure from them; an agency must apply criteria it has announced as controlling or otherwise satisfactorily explain the basis for its departure therefrom. *Squaw Transit Company v. United States,* 574 F.2d 492, (10th Cir. 1978). *See also: Atchison, T. & S. F. R. Co. v. Wichita Board of Trade,* 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973). If any departure occurred in the instant case in relation to the burden of proof criteria previously required by the ICC vis-a-vis the alternate route theory as distinguished from the direct route theory, we hold that it has been adequately supported and justified by reason of the 1978 reorganization of the Interstate Commerce Act, the enactment of the National Transportation Policy and the promulgation of the policy statement contained in 44 Fed. Reg. 60,296, *supra.* This approach is further bolstered, in our view, by the language employed in *Bowman Transportation, Inc. v. Arkansas Best Freight System, Inc., supra,* 419 U.S. at p. 283, 95 S.Ct. at 440, where the Court stated that the ICC's role in determining whether to grant a certificate was not predicated on the basis of the applicant's showing of maintaining the burden of persuasion but rather the "weighing [of] the competing interests ... [in] ... arriving at a balance that is deemed 'the public convenience and necessity.' "

Equity principles may be relied upon by the ICC in deciding interstate commerce cases. *Chemical Leaman Tank Lines, Inc. v. Interstate Commerce Commission,* 593 F.2d 241 (3d Cir. 1979). The record reflects that the ICC weighed the effect of the proposed service of Graves on the operations of Midwestern and TOX and concluded that the public would benefit from the fuel efficiencies and lower costs to be accomplished by the Graves proposal and that the operations of the protesting carriers would not be materially adversely affected.

The orders of the ICC are affirmed.